343 F.2d 730
 R. L. AUTREY and A. L. Goad, Individually and d/b/a Autrey and Goad Construction Company, et al., Appellants,
v.
WILLIAMS AND DUNLAP et al., Appellees.
WILLIAMS AND DUNLAP et al, Appellants,
v.
R. L. AUTREY and A. L. Goad, Individually and d/b/a Autrey and Goad Construction Company, et al., Appellees.
 No. 20306.
 United States Court of Appeals Fifth Circuit.
 February 24, 1965.
 
 COPYRIGHT MATERIAL OMITTED James L. Mitchell, Dallas, Tex., DeWitt T. Methvin, Jr., Alexandria, La., William M. Taylor, Jr., Dallas, Tex., John B. McNamara, Jr., Waco, Tex., Gist, Murchison & Gist, Alexandria, La., for Autrey and Goad et al.
 William L. Richards, William VanDercreek, Dallas, Tex., John L. Pitts, Alexandria, La., for Williams & Dunlap et al.
 Before RIVES and JONES, Circuit Judges, and BOOTLE, District Judge.
 RIVES, Circuit Judge.
 
 
 1
 These are appeals by all parties from judgments entered in seven consolidated actions[1] on a payment bond furnished by the prime contractor for a Capehart Housing Act[2] project.
 
 
 2
 The plaintiffs are subcontractors for the construction of the England Air Force Base Housing Project, which is located at Alexandria, Louisiana. The defendants are the prime contractor and the surety on the bond given to secure payments for labor and material furnished in the construction of the project.
 
 
 3
 The district court awarded some money to each of the plaintiffs, except McKerreghan, but the plaintiffs assert approximately fifty instances of error which, in essence, question the bases and amounts of the award. The defendants specify ten instances of error, one of which presents an initial question of the district court's jurisdiction.
 
 
 4
 I. Jurisdiction.
 
 
 5
 The district court held that jurisdiction for the plaintiffs' actions against the prime contractor and the bond surety was provided by the Miller Act,[3] and, alternatively, that jurisdiction was provided by 28 U.S.C. § 1352 (1958).[4]
 
 
 6
 The district court's holding is commensurate with this Court's decision in Lasley v. United States for Use of Westerman, 5 Cir. 1960, 285 F.2d 98. In Lasley we held that the jurisdictional provisions of the Miller Act are applicable in suits on payment bonds issued for Capehart Act projects. We held alternatively that such suits are within the purview of 28 U.S.C. § 1352.
 
 
 7
 The defendants urge us to reconsider Lasley and overrule its Miller aspects since two other Circuits have held that the Miller Act does not confer jurisdiction for suits on bonds for Capehart projects.[5] Therefore, they argue, federal jurisdiction does not exist for the plaintiffs' actions since none of the complaints predicated federal jurisdiction on 28 U.S.C. § 1352 (1958) and, furthermore, in the absence of proven compliance with the notice provisions of the bond, the suit cannot be maintained under section 1352.
 
 
 8
 We granted the motion of the plaintiffs for leave to amend their complaint on appeal, pursuant to 28 U.S.C. § 1653 (1958).[6] The defendants have filed additional briefs urging that the complaints cannot be amended under section 1653, that the instant case involves the supplanting of a wholly new and different basis of federal jurisdiction, rather than the amending of a defective allegation, and that the defendants would be unduly prejudiced. For the reasons given below in our reconsideration of Lasley, we do not reach the questions raised by section 1352 jurisdiction.
 
 
 9
 Continental Cas. Co. v. United States for Use and Benefit of Robertson Lumber Co., 8 Cir. 1962, 305 F.2d 794, and United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Constr. Co., 10 Cir. 1962, 305 F.2d 363, are not very positive holdings that the Miller Act does not confer jurisdiction for suits on bonds for Capehart projects. Specifically these two cases held that the Miller Act requirement of notice to the prime contractor within ninety days of the last delivery of materials[7] does not apply to a Capehart suit.
 
 
 10
 The basis of the Eighth Circuit's decision in Robertson Lumber Co. was the "unique nature" and "peculiar problems" in Capehart construction. More specifically,
 
 
 11
 "* * * the private construction and financing of Capehart housing and the joint administration of the Capehart program by the Department of Defense and the Federal Housing Administration presented problems not encountered in ordinary Government construction * * *." 305 F.2d at 799.
 
 
 12
 In that case the notice provisions in the bond were allowed to govern the suit and the less stringent notice provisions of the Miller Act were held inapplicable.
 
 
 13
 Although the Eighth Circuit stated that federal jurisdiction was established by 28 U.S.C. § 1352 (1958) "without regard to any relationship between the Miller Act and the Capehart Act," 305 F.2d at 798, any notion that Miller Act jurisdiction was unavailable for Capehart suits was vitiated by that Circuit's recent decision in Continental Cas. Co. v. Allsop Lumber Co., 8 Cir., 336 F.2d 445, 450-53. Although the Court adhered to Robertson in the respect that the notice provisions of a Capehart bond prevail over the notice provisions in the Miller Act, it was noted that the Court did "not regard the Robertson opinion as taking Capehart bonds `out of the Miller Act' in every respect and particularly so far as jurisdictional matters are concerned." 336 F.2d at 451. Moreover, in its latest decision, the Eighth Circuit held section 2(b) of the Miller Act, 40 U.S.C. § 270b (b), has application to a Capehart bond action and vests jurisdiction over that action exclusively in the federal court. Koppers Co. v. Continental Cas. Co., 8 Cir. 1964, 337 F.2d 499.
 
 
 14
 However, the basis of the Tenth Circuit's decision in Harrison & Grimshaw was that Capehart Housing Act projects are not "public works" within the meaning of the Miller Act.[8] Judge Pickett strongly dissented. It would seem that the Tenth Circuit's view is that the Miller Act is wholly inapplicable to Capehart suits and, hence, the jurisdictional provisions would not apply. Although title to Capehart housing does not pass immediately to the United States, due to the novel financing plan demanded by the exigencies of budgetary considerations, we believe that Capehart projects are patently public in nature.[9] Therefore, we reject the view that Capehart projects are not "public works." Our rationale in Lasley was that Congress considered that but for the bonding provisions of the Capehart Act[10] a prime contractor would be required to supply a builder with a Miller Act bond before entering upon a Capehart construction job. A Miller bond would be required because such a project falls within the language "construction * * * of any public building or public work of the United States." Note 8, supra. Therefore, we felt that the purpose of the bonding provisions in the Capehart Act was to provide a substitute for the bond described in the Miller Act, and that the jurisdictional provisions of the Miller Act are applicable to a Capehart suit. We adhere to that rationale. Furthermore, we note that if a Capehart suit is not subject to the jurisdictional provisions of the Miller Act, the rule in suits under that Act allowing extraterritorial service of process does not apply.[11] In this respect we do not think that Congress intended any less protection for Capehart suitors than it provided for Miller laborers and materialmen.
 
 
 15
 There is a difficult obstacle to a reaffirmance of Lasley, though not raised by the briefs, with which we must deal. Section 2 of the Miller Act provides that persons included within the purview of the bond who have not been paid in full for labor or material supplied are entitled "to sue on such payment bond * * * and to prosecute said action to final execution and judgment * * *," and, further, "every suit instituted * * * shall be brought * * * in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy * * *."[12] In 1956, this Court in Texas Constr. Co. v. United States for Use of Caldwell Foundry & Mach. Co.[13] held that this provision deals with venue rather than jurisdiction. This decision was in the context of a Miller Act suit. Four years later, we held in Lasley that the Miller Act vested a district court with jurisdiction of a suit on a payment bond issued under the Capehart Act. But more recently, in 1962, this Court, in a decision on the application of the United States Arbitration Act[14] to Miller Act suits, characterized the provision as one of venue.[15]
 
 
 16
 These determinations may be inconsistent unless the provision is read both to confer jurisdiction and to lay venue. It has been suggested that it is appropriate to construe the phrase "in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit" as conferring both jurisdiction on the United States district courts and venue in the district in which the contract is to be performed.[16]
 
 
 17
 Since the actions involved in the instant case were brought in the district where the prime contract was to be performed and executed, no question is presented as to the place of the actions. Thus for this decision we need only hold that the provision does grant jurisdiction to the district court.
 
 
 18
 We proceed to the merits.
 
 
 19
 II. Matters Applicable Generally.
 
 
 20
 The plaintiffs urge this Court to find as a fact that the prime contractor failed to properly prepare the site for the reception of the work of the subcontractors, to furnish materials in order to facilitate the work of the subcontractors, and to supervise and coordinate the work of the subcontractors so that the project could proceed in an orderly and economical manner, and that such failures constituted a breach of contract with all the subcontractors. The district court found as a fact that the plaintiffs, except for subcontractor Jinks, had not proven that the prime contractor breached the contract in these particulars. Autrey v. Williams & Dunlap, W.D.La.1962, 210 F.Supp. 491, 503.
 
 
 21
 The plaintiffs contend that certain facts specifically found by the district court (primarily those incident to the court's finding of breach in the Jinks action), or conclusively established because admitted or uncontradicted in the record, show that the district court erroneously concluded that the plaintiffs had not proven a breach of contract. In other words, certain facts found by the district court[17] or undisputed by the record[18] establish that the prime contractor failed in his duty to prepare the site, furnish materials and supervise and coordinate the work of the subcontractors. The plaintiffs urge that the prime contractor's failure in these particulars constituted a breach of the subcontracts.
 
 
 22
 We find it unnecessary to reach this question of breach of contract by the prime contractor. The district court prefaced its finding that the plaintiffs had failed to prove a breach by noting that the evidence was "bitterly disputed and cannot be reconciled." It found that "no serious protest (except by Jinks) was made at the time of these alleged incidents of breach. All parties rocked along until the government inspectors began to tighten up on approval requirements." 210 F.Supp. at 502. (Emphasis added.)
 
 
 23
 The plaintiffs do not challenge the finding of the district court that they failed to protest the alleged breach on the part of the prime contractor. It appears that each of them continued performance until his subcontract was terminated by the prime contractor, see 210 F.Supp. at 504, 511, 514, 518, 524, or completed, 210 F.Supp. at 519.
 
 
 24
 The principle is general that when a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, 5 Williston, Contracts § 688, at 300 (3d ed. 1961), unless the right to retain the excuse is not only asserted but assented to, ibid; see Louisiana Highway Comm. v. Farnsworth, 5 Cir. 1935, 74 F.2d 910, 913-14 (Road contractor's rights from failure to receive partial payment reserved and recognized before resuming work).[19] Thus, assuming that the prime contractor failed to prepare the site, to furnish materials and to supervise and coordinate the work, the plaintiffs elected to continue their respective contracts. See 5 Williston, Contracts § 683, at 270 (3d ed. 1961).
 
 
 25
 We proceed to the individual cases.
 
 
 26
 As the district court noted, the sub-contracts are identical except for the description of the work to be performed by the individual subcontractors. 210 F.Supp. at 499.
 
 
 27
 III. Autrey and Goad.
 
 
 28
 Plaintiffs Autrey and Goad were the carpentry subcontractors. Under the subcontract they were to receive the total sum of three hundred ninety-eight thousand, four hundred forty and 50/100 dollars ($398,440.50),[20]
 
 
 29
 "* * * payments to be made in monthly installments of 90 per cent of the value of the work completed in the building, leaving a balance of 10 per cent of the value of the completed work at all times unpaid, which balance shall be paid upon acceptance of the work of Williams and Dunlap Construction Company, Inc. by the Owner." (Subcontract, Article XII.)
 
 
 30
 Attached to the subcontract was a "breakdown schedule for payment" to Autrey and Goad. The schedule broke the carpentry work to be performed by them into items and, for progress-payment purposes, each subcontractor was to be paid under its contract on an item completion basis. Each item was assigned a fixed value for payment purposes, the "unit price, less 10% retainer under terms of contract." Appendix, p. 112.
 
 
 31
 Article XIII of the subcontract provided that
 
 
 32
 "* * * the Contractor shall file its schedule of completed work with Williams and Dunlap Construction Company, Inc. before the last day of each month, and payment on such schedule, provided same shall be found to be correct by Williams and Dunlap Construction Company, Inc. shall be due on or about the fifteenth of each month."
 
 
 33
 The district court found that as of December 31, 1957, the subcontract had been terminated and that the fault was mutual and both parties were guilty of a breach of contract. See 210 F.Supp. at 507. We disagree that there was a mutual breach of contract.
 
 
 34
 Autrey and Goad commenced performance of the work under their subcontract in April 1957. They continued to work in the performance of the subcontract until December 20, 1957. The first five schedule draws were submitted, approved by the defendant prime contractor and paid. The first three were paid on or about the fifteenth of the month; the last two payments were delayed "but no one was very angry yet. Then the Air Force began to tighten up on approval requirements, noting through various letters which appear in the record that too many deficiencies were being carried forward without correction." 210 F.Supp. at 505.
 
 
 35
 The sixth schedule draw was submitted on October 31, 1957 for $78,360.03. See Defendant's Exhibit 4(b) 11. It was approved by Williams and Dunlap but was not paid on or about November 15. The Federal Housing Administration approved the work on or about November 25. In the interval and before FHA approval the prime contractor advanced $18,500. The prime contractor deducted $7,000 from the balance due because of its conclusion that Autrey and Goad had failed to nail up certain cornice material and sheathing shown by a field check not to be in place. However, Autrey and Goad refused to accept the check in the reduced amount. But, subsequently on November 27, the prime contractor mailed to the Guaranty Bank a check in the amount of $52,814 to be paid on Autrey and Goad's account. See 210 F.Supp. at 506-07. The district court found that the prime contractor was obligated to pay the draw for $78,360.03 since the prime contractor had found the draw to be correct, and that the $7,000 deduction constituted a breach of contract. 210 F. Supp. at 507.
 
 
 36
 The seventh schedule draw was submitted on November 30, 1957 for $29,522. It was not acted upon by the prime contractor and was not paid at all. When Autrey and Goad were not paid on or about December 15, they reduced their work force to five men and, on December 20, they formally notified the prime contractor that they would do no further work "until such time as this subcontractor has been paid its November estimate, which estimate was due on about the 15th day of December." 210 F. Supp. at 507. The prime contractor replied on December 27 that since Autrey and Goad were not manning the job, the prime contractor would man the job beginning Monday, December 30, pursuant to Article XXIV of the subcontract.[21] This letter was answered on December 28 and the prime contractor was advised that if it placed any men on the job it would do so at its own expense. The prime contractor was also advised that Autrey and Goad would continue to maintain personnel on the job to accept payments and to correct any defects in its work and that they were ready, willing and able to complete its contract when the prime contractor brought its obligations to a current status.
 
 
 37
 The prime contractor took over the carpentry contract and Autrey and Goad demanded the balance allegedly due under the subcontract ($137,416.39). A civil action was filed and Autrey and Goad sought judgment for $312,000. The prime contractor claimed that it spent some $157,000 to complete the work required by the subcontract.
 
 
 38
 The district court found that the defendant prime contractor was guilty of a breach of the subcontract by not having paid in full and on or about November 15 the full amount of Autrey and Goad's sixth schedule draw, which was submitted on October 31 and found to be correct by the prime contractor. See 210 F. Supp. at 507. The court also found that plaintiffs Autrey and Goad breached the contract by not properly manning the job after December 15, 1957. The court entered judgment for Autrey and Goad in the amount of $26,937.33, together with interest.
 
 
 39
 The defendant prime contractor contends that it did not breach its contract with Autrey and Goad. It contends that since it had power to approve or disapprove any of the draws submitted, it had power to approve partially by withholding some $7,000 from the sixth schedule draw; it urges that the sixth draw was not approved for payment on November 15, as the district court states, but that the record reflects that the draw was stamped for approval on November 26, after FHA approval, and paid on November 27. The latter contention draws into question the construction of Article XIII, which is of substantial importance to the outcome of the present actions.
 
 
 40
 The prime contractor's construction of Article XIII is that the subcontractor is not entitled to payment on a draw submitted until his work has been approved by the several government agencies and administrative branches, e. g., the Federal Housing Administration. It argues that the only way the prime contractor could obtain approval of its draws was to have the work approved by the Government, "and certainly it was not going to `accept' the work until it was known that it was accepted by the Government."
 
 
 41
 The subcontractor's construction of Article XIII is, in essence, that Autrey and Goad were required to file their schedule of completed work with the prime contractor before the last day of each month and that unless the prime contractor pointed out errors prior thereto, payment on the draw schedule was due on or about the 15th of the month.
 
 
 42
 The district court was in accord with neither. Its construction was "that silence on the part of Williams and Dunlap is not to be interpreted as a finding of correctness. Affirmative approval was required. Of course, if there were no deficiencies there would be an obligation to act." 210 F.Supp. at 502.
 
 
 43
 We agree with the district court that the subcontractors' monthly draw payments of ninety per cent of the value of the work completed did not depend upon acceptance of his work by the several government agencies and administrative branches. We note that the only reference to acceptance of work by a person other than the prime contractor, as a condition of payment to the subcontractor, concerns payment of the ten per cent balance; such "balance [of 10 per cent of the value of the completed work] shall be paid upon acceptance of the work of Williams and Dunlap Construction Company, Inc. by the Owner." (Subcontract, Article XII.)
 
 
 44
 Furthermore, we think that Article XIII required the prime contractor to take action concerning the correctness of the subcontractors' schedule of work completed between the time it was submitted, before the last day of each month, and the time payment was due, on or about the 15th of the following month. We agree with the district court that a finding of correctness of the schedule of completed work and resulting payment on or about the 15th of the month did not foreclose the contractor from requiring defective work or improper materials to be corrected.[22] In this connection, we note that Article XII provides that ten per cent of the value of the work completed shall be retained from the monthly draws. The ten per cent retainage was to insure the correction of defective work or improper materials.
 
 
 45
 Therefore, we hold that the prime contractor breached its contract with Autrey and Goad by not acting upon the seventh draw, submitted on November 30, 1957 for $29,522 and which should have been paid on or about December 15 if found correct.
 
 
 46
 As noted earlier, the district court found that Autrey and Goad breached their contract by failing to maintain the job properly after they did not receive payment on or about the 15th of December. The court noted that Autrey and Goad were obligated under Article XXI (the arbitration clause)[23] to proceed under the written orders of Williams and Dunlap to complete the work. We think it doubtful that the arbitration clause contemplates a situation such as this where the prime contractor fails to take any action approving or disapproving the schedule of work completed by the subcontractor. But even if the arbitration clause does apply, we think it was the duty of the prime contractor to invoke it by notifying Autrey and Goad that a controversy existed as to payment on the seventh draw and by issuing written orders to Autrey and Goad. Therefore, we find that Autrey and Goad did not breach the contract by failing to man the job properly. By this action and subsequent communication to the prime contractor notifying it that no further work would be done on the project, and demanding the balance due under the subcontract. Autrey and Goad treated the breach as final.
 
 
 47
 We think Autrey and Goad are entitled to the unpaid installments of the contract price that may have become due and payable as a contract debt for work completed. In addition, they are entitled to money damages caused by the total breach of the contract by the prime contractor. These damages include all other unpaid installments of the contract price, less the cost of completion of the work, including correction of defective work, that is saved to the subcontractor by reason of the repudiation of the prime contractor, with additional compensation for any other injury that could not be reasonably avoided by the subcontractor and that the prime contractor had reason to foresee when the contract was made. See 5 Corbin, Contracts § 1094, at 509 (1964 ed.).[24] Where the cost of completion cannot be shown with any reasonable degree of certainty, the subcontractor should be given judgment for the amount of his expenditures, without regard to the cost of completion, unless the prime contractor shows that part of these expenditures were imprudent and unreasonable; in such a case, the judgment should not include the imprudent and unreasonable portion of the expenditures. 5 Corbin, op. cit., supra, § 1094, at 513.
 
 
 48
 IV. H. E. Luther.
 
 
 49
 Plaintiff Luther was the subcontractor for the masonry work. He was to be paid $59 per 1000 face brick and $118 per 1000 stone. The total to be paid under the subcontract was $83,077.63. 210 F.Supp. at 513. Luther began work in August 1957 but claims that he was run off the job on December 23, 1957. The district court found that the prime contractor's action in terminating this subcontract as of December 23 was wrongful, 210 F.Supp. at 511. Williams and Dunlap said they terminated the subcontract because Luther was not paying his bills, but the district court found that there was nothing in the subcontract that would permit the prime contractor to terminate for that reason; the district court noted that the only recourse open to the prime contractor was to retain out of any payment then due, or thereafter to become due, an amount to sufficiently and completely indemnify it.[25]
 
 
 50
 The letter of termination, written on December 20, 1957, stated in part:
 
 
 51
 "* * * it is not our responsibility to pay Mr. Luther's bills but, as required by our contract, it is Mr. Luther's responsibility to present us with paid bills for all labor and material and taxes at any time we might require in order that he might make a draw against his contract. We have requested that Mr. Luther present us with these paid bills and consider that if he fails to present us with these paid bills that he has breached his contract, specifically, the provisions of Article 14. If these bills are not presented to us by 9 AM Monday, December 23, we shall consider Mr. Luther's contract breached and shall man the job with men in our own employ charging the cost thereof against Mr. Luther's contract." 210 F.Supp. at 512.
 
 
 52
 The prime contractor contends that the termination was authorized by Article XXIV of the subcontract which allows take-overs and charge-backs after 48 hours' written notice to the subcontractor "should the [sub] contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen or material of proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of the agreements herein contained * * *." 1 Appendix, p. 117. The prime contractor argues that the subcontractor failed "in the performance of the agreement" by failing to present bills on demand as required by Article XIV. See note 25, supra. He urges that the letter quoted above supplied the timely notice required by Article XXIV.
 
 
 53
 We agree with the district court that the defendant prime contractor wrongly terminated the subcontract. Although the language in Article XXIV, "fail in the performance of the agreements herein contained," is broad, we do not think that the contract may be terminated under Article XXIV by any failure by the subcontractor to comply with any condition of the subcontract, as urged by the prime contractor. We think that Article XXIV concerns the failure to perform the actual work required under the subcontract; this is borne out by the limiting language in the latter part of the Article which provides that upon the neglect, refusal, or failure of the subcontractor, the prime contractor "shall be at liberty, after 48 hours written notice to the Contractor, to provide any such labor or materials and to deduct the cost thereof from any money then due. * * *" (Emphasis added.) Therefore, we conclude that Article XXIV may not be used to terminate the contract for the subcontractor's failure to present paid bills on demand as required by Article XIV.
 
 
 54
 Although the district court found that the defendant prime contractor had breached the subcontract by its wrongful termination, the court found that Luther was not making any profit off the job and that he did not sustain any loss by the breach. See 210 F.Supp. at 513. The court also found that had the subcontractor been allowed to complete the contract, he would have lost some $16,500. But the court awarded damages for some of Luther's equipment confiscated by the prime contractor after the contract was wrongly terminated. The amount of this award was $1,500 with interest. 210 F.Supp. at 514. However, Luther contends that pursuant to a memorandum decision by the district court entered on September 17, 1962, the amount of this recovery was increased to $2,220. Record p. 167.
 
 
 55
 Luther contends that he is entitled to a balance due for work allegedly completed and accepted by the prime contractor prior to the termination of the subcontract. He states that he submitted his last progress payment on December 18, 1957, showing work in place in the sum of $55,088.04. And he urges that since the amount of previous payments to him was $41,550.55, he is entitled to the $13,537.49. His theory is that the prime contractor has not advised him that any of the work on the completion schedule of December 18 was unacceptable and, therefore, "as a matter of law it is accepted by the prime contractor."
 
 
 56
 We noted in connection with Autrey and Goad's appeal that the prime contractor has the duty to act upon the draw schedules between the time they are submitted, before the last day of the month, and the time payments are due, on or before the fifteenth of the subsequent month. However, the Luther draw was submitted on December 18; therefore, we do not think the prime contractor had a duty to act by the time the contract was terminated on December 23. Payment was not due at the time of termination since Luther had not submitted its schedule before the last day of the month as required by Article XIII.
 
 
 57
 Luther also contends that the record establishes lost profits on the uncompleted portion of the contract in the amount of $12,989.59. However, we have carefully read that portion of the record cited to us [Vol. 5, pp. 1308-13] and conclude that it does not establish that he is entitled to profits. That testimony is in essence an estimate by Mr. Luther of what his profits would have been had he completed the contract. In cases where damages are claimed for having been deprived of profits, the contemplated profit must be proved to be reasonably certain and not merely conjectural or speculative, see Mabry v. Midland Valley Lumber Co., 217 La. 877, 47 So.2d 673, 677 (1950), or an estimate. Guidry & Swayne v. Miller, 217 La. 935, 47 So.2d 721, 723-724 (1950). The judgment in Luther v. Williams & Dunlap, Civil Action No. 7233 below, is affirmed.
 
 
 58
 V. Conner and Brownfield.
 
 
 59
 Conner and Brownfield, the concrete subcontractor, sought to recover their final estimate and for damages allegedly caused by specified acts of the prime contractor. On the other hand, the prime contractor insisted that Conner and Brownfield failed to perform fully their subcontract by not doing their work in a good and workmanlike manner. The prime contractor alleged that it expended $37,195.05 to complete this subcontract and that Conner and Brownfield owed it $24,762.85.
 
 
 60
 The district court found that Conner and Brownfield substantially performed their subcontract and were therefore entitled to recover the full contract price (including the agreed to extras) less the amount that was necessary to correct deficiencies so as to bring the subcontract performance into exact compliance. See 210 F.Supp. at 514.
 
 
 61
 The district court found that the total contract price, exclusive of any extras was $109,523.67; it found that Conner and Brownfield were paid $88,978.12, leaving a balance of $20,545.55. To the balance of $20,545.55, it added a credit of $1,786 which represented the difference between the sum of $10,150 and the prime contractor's actual cost of form work deleted by an amendment to the subcontract. The total amount due was $24,511.99.
 
 
 62
 For the amount necessary for the prime contractor to correct deficiencies, the district court found that "a credit of $11,704.11 to complete the contract would be fair." 210 F.Supp. at 156. The prime contractor contended that it spent $37,195.05 to complete the subcontract. The evidentiary basis for this amount consists of detailed "Foreman's Daily Reports" and payroll. See 210 F.Supp. at 516; Defendant's Exhibit 58. The court noted that the employees worked on different jobs on the same day and then approximations were made by the foreman or the bookkeeper as to what proportions were chargeable to what subcontract. Therefore, the court accepted the Foreman's Daily Reports and payroll [Defendant's Exhibit 58] "as proof that much work was necessary but not as proof that $37,195.05 was spent to complete the job." 210 F.Supp. at 516. The court noted that $19,000 of this amount was spent for work which the prime contractor itself considered to be unreasonable, unnecessary, and over and above the contract requirements. As noted earlier, the court found that on this record a credit to the prime contractor of $11,704.11 to complete the contract would be fair. The court stated: "Incidentally, the figure of $11,704.11 is 10 per cent of the total contract price, plus extras, which under normal circumstances would have been the retainage to correct defects." 210 F.Supp. at 516.
 
 
 63
 From this statement of the district court, Conner and Brownfield urge that it is obvious that the court did not find that it cost $11,704.11 to correct the alleged deficiencies, but, instead, the court "just allowed an arbitrary figure of 10% of the contract price for the correction of deficiencies."
 
 
 64
 After examining Defendant's Exhibit 58, as well as other portions of the record cited to us by the prime contractor,[26] and cited by Conner and Brownfield,[27] we conclude that the district court's finding that defects existed was not clearly erroneous. However, we note that by Louisiana law the prime contractor "must establish not only the existence of the defects * * * [of which he complains], but also the amount of the reduction to which he is entitled, i. e., the expenditures necessary to correct the defects." Papa v. Louisiana Metal Awning Co., 131 So.2d 114, 117 (La.Ct.App. 1961) (Emphasis added.); see Loeb v. Nielson, 128 So.2d 447, 448 (La.App. 1961). That court noted that the difficulty of introducing evidence as to damages does not justify a discretionary assessment of damages by the trial judge. 131 So.2d at 117; see Loeb v. Neilson, 128 So.2d 447, 449 (La.App. 1961). In light of these authorities, we think that the prime contractor is not entitled to a discretionary assessment of 10 per cent of the total contract price, but that the amount should be the expenditures necessary to correct the defects which the prime contractor can determine and prove. We, therefore, reverse and remand on this point.
 
 
 65
 However, in remanding, we feel it necessary to dispose of two other contentions made by Conner and Brownfield. They urge that the district court should have entered judgment for Conner and Brownfield against their cement-finishing subcontractor, Sam Young, for the prime contractor's costs to correct deficiencies since the court found that the record was replete with evidence that "it was Mr. Young's work that was so very defective." 210 F.Supp. at 517. The simple answer to this contention is that no such request was made (or at least it has not been pointed out in the record). We recognize that the plaintiffs filed a motion to bring in Sam Young's surety, United States Casualty Company, as a third-party defendant. But Conner and Brownfield's basis for the motion was that complete relief could not be granted because the defendants, the prime contractor and its surety, had filed a counter-claim; the counterclaim alleged that the cost of completing Conner and Brownfield's contract was increased by their failure to comply with plans and specifications and defective workmanship, necessitating large expenditures in correcting the work improperly performed by Conner and Brownfield. See Record, pp. 213-214. The motion stated that the subject of the counterclaim was the cement finishing done by Sam Young. The district court denied that motion "with full rights to refile when and if there is a judgment herein against Conner-Brownfield — July 25th-1961." Record, p. 215. The defendants' counterclaim was not granted. We fail to see why this motion to bring in a third-party defendant should operate as an automatic judgment for the cost to correct deficiencies against Sam Young and his surety without opportunity to litigate the question of their liability since the motion to implead was denied. It may be that the district court should have granted the plaintiff's third-party motion. See Fed.R.Civ.P. 14(b); Wright, Federal Court § 76 (1963). At least it would not seem that the test for granting or denying the motion is whether or not there is a judgment actually entered against the plaintiff seeking to implead. However, we note that Conner and Brownfield have not specified as error the denial of this motion. They assert, as we stated above, that judgment should have been entered against Sam Young for the amount deducted from Conner and Brownfield's claim against the prime contractor.
 
 
 66
 Conner and Brownfield also contend that they are entitled to recover the extra cost incurred in performing the concrete work which was caused by the failure of the prime contractor to prepare the site, coordinate the work and furnish materials. The district court found that they had failed to prove the extra cost. 210 F.Supp. at 514. They urge that the prime contractor "admitted" the extra cost since it filed a claim against the Government and alleged as a fact that this subcontractor was damaged in the sum of $24,000. But they note in their brief: "It should be remembered that this is the section of the claim that the prime contractor insisted was solely for the benefit of the subcontractors and covered their claims." Brief for Subcontractors, p. 256. Since the prime contractor's claim was solely for the benefit of the subcontractors and covered their claims, we do not think that the allegation that this subcontractor was damaged in the sum of $24,000 is an admission by the prime contractor of such extra costs.
 
 
 67
 The prime contractor contends that the district court erred in determining the basic contract price. The parties stipulated that "the base contract figure totalling the Conner and Brownfield subcontract for concrete work is $109,523.67." 210 F.Supp. at 517. The prime contractor urges that the stipulated figure was the base contract price before the deduction of $10,150, omitted from the subcontract by the amendment of June 27, 1957. The district court concluded that the stipulated figure was the base contract price after the deduction of $10,150. After studying the position of the parties as to what was meant by the stipulation, Record pp. 95-102 (letter to Judge Hunter from DeWitt Mettwin, Jr., June 2, 1962; letter to Judge Hunter from David A. Sheffield, June 19, 1962), we are in accord with the district court.[28]
 
 
 68
 VI. United Insulation Company (Thomas P. Simpson).
 
 
 69
 United Insulation Company (Thomas P. Simpson) was the subcontractor for insulation. The total price of its contract was $36,495. United Insulation was paid $31,945.50. It completed its contract and the district court found that no defects existed or were even alleged. The district court awarded United Insulation the balance on the contract, $4,549.50 plus $280.88 for truck rental, an undisputed item, and reasonable attorney's fees in the amount of $1,500. As a basis for the award of attorney's fees, the court found that the prime contractor's failure to pay the balance due on the contract was arbitrary, capricious, and without probable cause. See Louisiana Statutes Annotated-R.S. 22:658.
 
 
 70
 United Insulation contends on appeal that, in addition to the amount the district court awarded, it is entitled to recover $5,400 in extra labor costs and $5,275.25 in lost profits. In addition, United Insulation contends that the amount of attorney's fees awarded is inadequate.
 
 
 71
 The district court found that United Insulation had never notified the prime contractor of any extra costs and had not protested or claimed any extra costs, prior to suit. Furthermore, the court found that United Insulation failed to prove that it was required to furnish extra labor and/or material at the direction of or because of action of Williams and Dunlap. After examining those portions of the record cited to us by United Insulation [Record, pp. 1200-28; Joint Appendix, pp. 225-28 (Change Order A-2), we agree with the district court.
 
 
 72
 We think that United Insulation is not entitled to recover on its claim for lost but anticipated profits. To allow its claim would amount to a double recovery against the prime contractor. More specifically, we noted earlier that, in case of breach by the prime contractor, the subcontractor is entitled to
 
 
 73
 "unpaid installments of the contract price, less the cost of completion of the work, including correction of defective work, that is saved to the subcontractor by reason of the repudiation of the prime contractor, with additional compensation for any other injury that could not be reasonably avoided by the subcontractor and that the prime contractor had reason to foresee when the contract was made.
 
 
 74
 * * * * *
 
 
 75
 "Stated in another form, the subcontractor can recover damages measured by his actual expenditure to the date of breach, less the value of his materials on hand, plus the amount of the profit that he can prove with reasonable certainty would have been realized in case of full performance of the contract."
 
 
 76
 (Emphasis added.) Both forms of the rule stated above achieve the same measure of recovery. See 5 Corbin, Contracts § 1094, at 509-13. Therefore, it is error to allow recovery for the "profits" allowed under the second-stated form of the rule when the measure of recovery is computed on basis of the first-stated form of the rule.
 
 
 77
 In regard to attorney's fees, United Insulation offers no theory of increasing the amount of the award other than that "this Court can judicially know that this award is inadequate and can here review the question of reasonable attorney's fees in this case and can award to this subcontractor an adequate sum. * * *" Brief for Subcontractors, p. 218. We think the amount of attorney's fees is in the discretion of the district court. Since United Insulation has offered no concrete theory of how the district court abused its discretion, the court's award is affirmed.
 
 
 78
 The prime contractor did not specify an error in this case in its original brief.
 
 
 79
 The decision of the district court is affirmed.
 
 
 80
 VII. B. M. Jinks.
 
 
 81
 B. M. Jinks was a subcontractor whose duty it was to perform various portions of the work incident to the housing project. His work included excavation work and grading and filling. 210 F.Supp. at 520.
 
 
 82
 The district court found that the prime contractor breached the subcontract with Jinks by its failure: to prepare the site to receive the work of Jinks; to provide the necessary engineering to Jinks at the time and place needed; and to furnish fill material at the time and in the quantities needed. 210 F.Supp. at 522.
 
 
 83
 The prime contractor contends that testimony of Jinks establishes the difficulties created in his performance were attributable to the Air Force and the off-site contractor and therefore these difficulties cannot be charged to the prime contractor. However, we note that the district court stated that all parties agreed
 
 
 84
 "that the prime contractor had the duty to prepare the site to receive the work of the subcontractor; to properly coordinate the work of the various subcontractors; to provide competent and adequate supervision of the overall project; to furnish materials necessary in sufficient quantities and to schedule deliveries so as to enable the subs to proceed with their work in an orderly manner." 210 F.Supp. at 502.
 
 
 85
 This stipulation is not contested by the prime contractor.
 
 
 86
 The prime contractor "terminated" Jinks subcontract pursuant to Article XXIV of the subcontract. The termination notice read:
 
 
 87
 "Due to your evident lack of interest and lack of application of your time and energies to the completion of this job, we are invoking Article 24 of your contract. Under the terms of the aforementioned article, we are giving you 48 hours' notice that we are taking over your contract and turning it over to the bonding company for completion." 210 F.Supp. at 521.
 
 
 88
 The district court found that this termination was arbitrary and without cause or justification, and constituted a breach of contract. 210 F.Supp. at 522. We are in accord with the district court. We note that if Jinks was guilty of a lack of interest and lack of application of time and energy to the completion of the work under the subcontract, it was due to the failure of the prime contractor to prepare the site, to furnish material and to engineer fully the site.
 
 
 89
 The prime contractor contends that the testimony of Jinks establishes full acquiescence with the termination. No citation to the record is made in support of this contention. Furthermore, we note that the district court found that the termination notice barred Jinks from coming on the project and when he did come on the job to get material he was arrested and taken into custody. See 210 F.Supp. at 521.
 
 
 90
 Having found that Jinks had failed to prove the amounts of profits lost, the district court restricted his recovery to an amount equal to the remainder after subtracting the amount received by him for the total of his expenditures attributable directly to the subcontract. 210 F. Supp. at 522.
 
 
 91
 The district court found that there was an amount of $47,896.79 chargeable as expenditures. However, the court found that charges of $775, $516.50 and $1,000 appearing on the adding machine tape in evidence were not supported by checks or bills and that cash disbursements totaling $1,330.29 were not properly attributable to this subcontract. These amounts were deducted, leaving a total of $44,275.35 in expenses. The court found that the prime contractor had paid Jinks $30,400.99 and that plaintiff was entitled to the difference which was $13,874.36.
 
 
 92
 Jinks contends that he is entitled to recover the sum of $9,300 for his lost profit on the job. However, after examining those portions of the record [Record, pp. 496, 502, 715, 758, 1978] cited to us, we are in accord with the district court's conclusion that Jinks has failed in his burden to prove lost profits. As we stated earlier, "the contemplated profit must be proved to be reasonably certain and not merely conjectural or speculative." Text p. 742, supra.
 
 
 93
 Mr. Jinks contends that the amount of his expenses total $50,396.79 instead of the $47,896.79 as found by the district court before deductions. The $2,500 difference he argues is attributable to a bill owed to Berry Brothers Equipment Company, Appendix 329 (Plaintiffs' Exhibit 329), which the district court inadvertently omitted from its tabulation of expenditures. Jinks' theory is that the court acknowledged the $2,500 as a legitimate expense. Actually the court only said that "the remark I made a moment ago may not be true * * * he may be entitled to recover that amount. * * *" Record, p. 713; see Record, pp. 710-13. In light of the fact that the prime contractor has not specifically challenged this contention, we are inclined to include that amount. However, we think the better practice is to remand to the district court for a determination of whether or not the Berry bill was inadvertently omitted as an expenditure.
 
 
 94
 Jinks also contends that the three deductions made from the $47,896.79 figure because they were not supported by checks or bills "has no support anywhere in the Record." However, instead of bringing forth bills or checks to support the three deductions, he contends that "it wasn't represented that there was a check for every item on the adding machine tape and nowhere in the Record is there any of the amounts shown on the tape questioned." We do not think that the district court acted incorrectly in refusing to accept figures on an adding machine tape which were unsupported by corresponding checks or bills.
 
 
 95
 Jinks further urges that the $1,330.29 deduction has "no support in the Record anywhere (except in a Trial Brief filed by defendants)." The reason given for this deduction was that it was not properly attributable to an expenditure for this subcontract. See 210 F. Supp. at 523. The prime contractor does not challenge the contention that this deduction has no support in the record. Therefore, we conclude that this finding by the district court is clearly erroneous.[29]
 
 
 96
 The district court found that pursuant to the prime contractor's termination notice it took possession of four major pieces of equipment belonging to Jinks. See 210 F.Supp. at 523. The court found that this equipment was damaged in the amount of $2,000 through neglect and misuse over and above normal wear and tear during the five-month period it was retained by the prime contractor. See 210 F.Supp. at 524. The court denied any additional recovery for rental value of this equipment, noting that it would require more persuasive evidence of rental values than those offered by the plaintiff.
 
 
 97
 The prime contractor contends that "there is no right for Jinks to recover for the use of his equipment." Brief for Appellant (Williams and Dunlap), p. 13. He states that except for normal weathering and normal wear and tear, Jinks got his equipment back in as good condition as it was when he left it. See Post-argument Brief for Williams and Dunlap, p. 72. These statements are unsupported by the record or by authority.
 
 
 98
 Jinks contends that he is entitled to $14,100 for equipment rental and $15,600 for depreciation over and above normal wear and tear.
 
 
 99
 The only testimony as to the depreciation value or rental value of his equipment was Mr. Jinks' testimony. Brief for Subcontractors, pp. 278-83. We do not think that the district court was required to accept this testimony of the plaintiff at face value. Therefore, we are in accord with the district court's finding of damages in the amount of $2,000 and that Mr. Jinks had failed in his proof of rental value. We note that expert testimony is appropriate for proving the rental value of machinery. See Corbin, Contracts § 1094, at 513 (1964 ed.).
 
 
 100
 Jinks also contends that the amount paid to him by the prime contractor was $25,364.09, instead of $30,400.99 as found by the district court. However, we find no citation to the record which would support such a contention.
 
 
 101
 The judgment of the district court as to subcontractor Jinks is therefore reversed and remanded.
 
 
 102
 VIII. P. L. Fears.
 
 
 103
 P. L. Fears was the subcontractor to furnish material and labor necessary for the ceramic tile work. The work included furnishing and installing bath accessories, access panels, shower curtain rods and shower curtains. See 210 F.Supp. at 524; Appendix 133 (Fears subcontract). The district court found that Fears had substantially performed his contract and that the work was complete except for four bathrooms that were not ready for tile and a number of bathrooms that required replacement tile (approximately 150 pieces) when the prime contractor gave him a 48-hour termination notice and changed the locks on Fears' supply house. The court found that the 48-hour termination notice was ineffective since the prime contractor took over the subcontract the day the notice was received by Fears. The court found that the prime contractor had "technically" breached the subcontract, noting that Fears had "`had enough' and more or less acquiesced in this takeover." 210 F.Supp. at 525. The court found that Fears' balance due under the subcontract was $13,540.39. From this balance the court deducted $6,000, the amount it found was required to bring the subcontract to complete compliance. The court denied Fears' claim for $880.30 for material allegedly confiscated, noting that he had failed to prove confiscation of this property by the prime contractor. 210 F.Supp. at 525-26.
 
 
 104
 The prime contractor contends that a technical breach of the notice provision does not amount to a breach of the contract where the subcontractor fully acquiesced in the termination and incurred no damages or inconvenience as a result of the less than 48-hour notice. We do not read the district court's opinion as finding that Fears waived the breach. The district court said that the breach was "at least a `technical' breach * * *." 210 F.Supp. at 525. (Emphasis added.) We note that the prime contractor manned the job and changed the locks on Fears' supply house. Surely this constituted a repudiation of the subcontract.
 
 
 105
 The prime contractor also contends that Fears did not substantially perform the subcontract. He argues that there was more work to be done on this subcontract than the four bathrooms and replacement tile. This contention is supported by testimony from the contractor's witnesses. However, Mr. Fears testified that this was all the work left to be done. See, e. g. Record, 1448-49. We think, therefore, that this depended in large part upon the credibility of the witnesses. We note that the district court stated "for the record that I am impressed by Mr. Fears as a competent and intelligent witness." Record, p. 1462.
 
 
 106
 The subcontractor contends that the cost to bring the subcontract into complete performance is $380, instead of the $6,000 as found by the district court. The prime contractor claimed some $24,558.67 as the amount necessary to complete the subcontract. See 210 F.Supp. at 525. In light of the great disparity in the evidence on this point, we cannot say that the district court's finding of $6,000 is clearly erroneous. We note that Fears himself admitted to an amount substantially above $380. See Record, pp. 1444-45.
 
 
 107
 The subcontractor urges that the district court erred in denying its claim for equipment allegedly confiscated by the prime contractor. The equipment allegedly confiscated and the value assigned to it by Fears is found in his testimony. Record, pp. 1443-44. As we noted earlier, the district court is not bound to accept such assigned values at face value. We think Fears has failed to prove the value of the material allegedly confiscated.
 
 
 108
 The subcontractor also contends that he is entitled to $14,862.69 for excess labor and material costs because of the failure of the prime contractor to prepare the site, furnish materials and to coordinate the work. After examining that portion of the record cited to us on this point [Record, pp. 1442-43] and in light of what we have said previously about the proof of excess costs to perform, we think that the subcontractor has failed in his burden of proof.
 
 
 109
 The subcontractor also claims $20,353.28 for "lost profits." As we have noted earlier, it is incorrect to allow recovery for the "profits" allowed under the second-stated form of the rule when the measure of recovery is computed on the basis of the first-stated form of the rule. See text p. 744, supra.
 
 
 110
 The judgment as to subcontractor Fears is therefore affirmed.
 
 
 111
 IX. C. H. McKerreghan.
 
 
 112
 C. H. McKerreghan was a subcontractor for 2" and 4" gas mains and 1" and 1¼" gas service lines and for all concrete headwalls and concrete curb inlets. See Defendant's Exhibit 2.1. McKerreghan's contract was with the entity, Williams, Dunlap, and Young, which was the utility subcontractor for the housing project.
 
 
 113
 "Considering the totality of facts," the district court found that McKerreghan did not substantially perform his contract, that his work was mismanaged, very poor, and that unacceptable installation was the rule rather than the exception. Therefore the district court concluded that he was not entitled to recover under the contract. 210 F.Supp. at 518-19.
 
 
 114
 In essence, McKerreghan contends that he did substantially perform his contract and that he is entitled to recover the balance due under the contract, extra costs and for lost profits, or a total of $22,246.47.
 
 
 115
 However, we note that the district court found that, "assuming arguendo that McKerreghan had substantially completed his contract, we would nevertheless reach the conclusion that Mr. McKerreghan has nothing coming to him." 210 F.Supp. at 519. The court noted that the total contract price was $24,889.80, and that McKerreghan was paid directly $19,627.33 and that $3,866.47 was paid to others in his behalf. Concerning the balance of $1,396, the court emphasized that this much at least was necessarily expended in completing the testing of the gas lines and in making fundamental repairs.
 
 
 116
 McKerreghan does not contend that the district court was in error in finding that $3,866.47 was paid to others in his behalf, although he does consider that figure as being arbitrarily assigned by the prime contractor's bookkeeper and foreman. However, McKerreghan does contend that he is entitled to $12,234 for extra work performed and to $7,000 for profits lost, due to alleged breaches of contract by the prime contractor. We note, however, that the district court found that McKerreghan's alleged extra work, if any occurred, arose out of his own misjudgment and was not the fault of the partnership of Williams, Dunlap and Young. After reviewing the evidence on this point [compare Record pp. 2083-88 with Record pp. 1719-29], we conclude that the finding of the district court was not erroneous. And even if McKerreghan was entitled to "lost profits," we think he has failed to prove the amount of his claim with reasonable certainty. See Record, p. 2084.[30]
 
 
 117
 X. Attorneys' Fees.
 
 
 118
 The district court held that the recovery of interest, costs and attorneys' fees is governed by the law of Louisiana. The subcontractors argue on appeal that attorneys' fees are governed by the laws of Texas "in light of the facts and circumstances surrounding the execution of the subcontracts. * * *" However, we note that the theory of the subcontractors in the district court was that the laws of Louisiana govern attorneys' fees. They admit that they "may have mislead (sic) the Trial Court in this particular." We are not disposed to allow them to change their theory in this matter on appeal.
 
 
 119
 Furthermore, we do not think the findings of the district court regarding the recovery or award of attorneys' fees are clearly erroneous.
 
 
 120
 The judgment in Autrey and Goad v. Williams and Dunlap, C.A. No. 7228 below, is reversed and remanded.
 
 
 121
 The judgment in Luther v. Williams and Dunlap, C.A. No. 7233 below, is affirmed.
 
 
 122
 The judgment in Conner and Brownfield v. Williams and Dunlap, C.A. No. 7235 below, is reversed and remanded.
 
 
 123
 The judgment in United Insulation Company (Thomas P. Simpson) v. Williams and Dunlap, C.A. No. 7542 below, is affirmed.
 
 
 124
 The judgment in B. M. Jinks v. Williams and Dunlap, C.A. No. 7627 below, is reversed and remanded.
 
 
 125
 The judgment in P.L. Fears v. Williams and Dunlap, C.A. No. 7628 below, is affirmed.
 
 
 126
 The judgment in C. H. McKerreghan v. Williams and Dunlap, C.A. No. 7462 below, is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Except in McKerreghan v. Williams and Dunlap
 
 
 [2]
 42 U.S.C. §§ 1594-1594j, amending sub-chapter VIII of The National Housing Act, 12 U.S.C. §§ 1748-1748h, 1748i
 
 
 [3]
 40 U.S.C. §§ 270a-e
 
 
 [4]
 "The district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States."
 
 
 [5]
 Continental Cas. Co. v. United States for Use and Benefit of Robertson Lumber Co., 8 Cir. 1962, 305 F.2d 794; United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Constr. Co., 10 Cir. 1962, 305 F.2d 363
 
 
 [6]
 Section 1653 provides: "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."
 
 
 [7]
 "[A]ny person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed." Title 40, U.S.C.A. § 270b(a)
 
 
 [8]
 
 "§ 270a. Bonds of contractors for public buildings or works; waiver of bonds covering contract performed in foreign country
 "(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, [performance bond and payment bond] * * *." Title 40, U.S. C.A. § 270a.
 
 
 [9]
 See 111 U.Pa.L.Rev. 1014, 1016 (1963); 49 Va.L.Rev. 174, 178-9 (1963). "In a situation such as this, technicalities concerning the present state of title ought not to be paramount, especially since the Supreme Court has in the past been willing in some instances to dispense with the title requirement completely. United States, ex rel. Noland Co. v. Irwin, 316 U.S. 23 [62 S.Ct. 899, 86 L.Ed. 1241] (1942)." Id. at 178-9 & n. 26
 
 
 [10]
 "The Secretary of Defense or his designee is authorized to enter into contracts with any eligible bidder to provide for the construction of urgently needed housing on lands owned or leased by the United States * * *. Any such contract shall provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee,and the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of section 270a of Title 40, and no additional bonds shall be required under such section." 42 U.S.C.A. § 1594(a) (1958). (Emphasis added.)
 
 
 [11]
 United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Constr. Co., 10 Cir. 1962, 305 F.2d 363, 369; see Continental Cas. Co. v. Allsop Lumber Co., 8 Cir., 336 F.2d 445, 450-453, petition for cert. filed, 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (U.S. Oct. 27, 1964)
 
 
 [12]
 40 U.S.C. § 270b (1958), as amended, 40 U.S.C. § 270b (Supp. IV, 1963)
 
 
 [13]
 236 F.2d 138 (5 Cir., 1956)
 
 
 [14]
 9 U.S.C. §§ 1-14 (1958)
 
 
 [15]
 Electronic & Missile Facilities, Inc. v. United States for Use of Moseley, 306 F. 2d 554 (5 Cir. 1962), rev'd on other grounds, 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963)
 
 
 [16]
 See 76 Harv.L.Rev. 635, 638 (1963)
 
 
 [17]
 The prime contractor owed a duty to prepare the site, to supervise and coordinate the work and to furnish materials. 210 F.Supp. at 502. The prime contractor knew that there was a need for fill material but failed to bring it to the site. His failure made it almost impossible to drain the area
 The prime contractor required the utilities to go ahead of street grading. He required Jinks to build house pads before he cut his streets and failed to provide adequate engineering to Jinks. The tile subcontractor was forced to install tile in houses which were not ready.
 The prime contractor failed to furnish siding and cornice material consistent with the timely needs of the carpentry subcontractor. He failed to furnish windows at the time needed. The failure to furnish siding, windows and cornice materials was one of the reasons for deficiencies and incompleteness and the failure of the Federal Housing Administration to pay the prime contractor on time.
 
 
 [18]
 The prime contractor failed to provide access roads in and through the construction area. The subcontractors testified as to lack of coordination and supervision and the Air Force complained of the same deficiency
 
 
 [19]
 In the cases the plaintiffs cite to support their argument that the prime contractor's failure to prepare the site, furnish materials and supervise and coordinate the work, the subcontractor timely protested the prime contractor's breach. See Continental Cas. Co. v. Schaefer, 9 Cir. 1949, 173 F.2d 5, 7; Merando v. Mathy, 1945, 80 U.S.App.D.C. 281, 152 F.2d 21; Great Lakes Constr. Co. v. Republic Creosoting Co., 8 Cir. 1943, 139 F.2d 456, 464
 
 
 [20]
 Later certain extras were authorized, bringing the total amount to $404,006. See 210 F.Supp. at 504
 
 
 [21]
 Article XXIV provides, in part:
 "Should the Contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen or material of proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of the agreements herein contained, the Williams and Dunlap Construction Company shall be at liberty, after 48 hours written notice to the Contractor, to provide any such labor or materials and to deduct the cost thereof from any money then due or thereafter to become due to the Contractor under this contract."
 
 
 [22]
 Article XVII of the Subcontracts provides that,
 "No partial payment made for work under this contract shall be conclusive evidence of the performance, either wholly or in part, of this contract, and the final payment shall not be construed to mean an acceptance of defective work or improper materials."
 
 
 [23]
 "If at any time any controversy shall arise between Williams and Dunlap Construction Company, Inc. and the Contractor with regard to any matter or thing involved in this contract, and which the parties hereto do not promptly adjust and determine, or which the Architect cannot decide to the satisfaction of both parties hereto, then the written orders of Williams and Dunap Construction Company, Inc. shall be followed and said controversy shall be decided by arbitration at the end of the work, and before final settlement is made between Williams and Dunlap Construction Company, Inc. and the Contractor."
 
 
 [24]
 Stated in another form, the subcontractor can recover damages measured by his actual expenditure to the date of breach, less the value of his materials on hand, plus the amount of the profit that he can prove with reasonable certainty would have been realized in case of full performance of the contract. 5 Corbin, op. cit., supra § 1094, at 511-12
 
 
 [25]
 Article XIV of the Subcontract provides:
 "Before making the above payments [monthly schedule draws], Williams and Dunlap Construction Company, Inc. reserves to themselves the right to demand and receive duly receipted bill for all materials and labor in any way entering into this work, and written releases from all parties having claims against the work."
 Article XV provides:
 "If at any time there shall be evidence of any lien or claim for which, if established, Williams and Dunlap Construction Company, Inc. or Owner, or property of the Owner or the improvements, might become liable and which is chargeable to the Contractor, Williams and Dunlap Construction Company, Inc. shall have the right to retain out of any payment then due, or thereafter to become due, an amount sufficient to completely indemnify both or either of them against any claims or liens." 1 Appendix, p. 116
 
 
 [26]
 Post-argument Brief for Williams and Dunlap, p. 46; see Record, Vol. 9, pp. 2591-95 (testimony of Grossman, bookkeeper); Record, Vol. 8, pp. 2221-77 (testimony of Wesley, foreman for concrete corrections)
 
 
 [27]
 Brief for Subcontractors pp. 249-52; see Appendix 191-93, 225-28 (prime contractor's claim A-2 against the Government); Record, Vol. 17, pp. 4992-5013 (testimony of Boyett, deputy base engineer at England Air Force Base)
 
 
 [28]
 This was the only error specified by the prime contractor in its original brief. However, in its post-argument brief it raises other errors. We do not consider those errors since they were not raised in its original brief. See Rule 24 of Rules of the United States Court of Appeals for the Fifth Circuit
 
 
 [29]
 It should be noted that the Court, subsequent to oral argument, directed the Clerk of the Court to write counsel for the defendants and request them to reexamine their briefs in light of this Court's Rule 24. That rule requires that the briefs of the parties contain "reference to the pages of the record and the authorities relied upon in support of each point." Although the briefs requested were received we are unable to locate any reference to the record which would support the $1,330.29 deduction made by the district court. We regret that this may possibly cause an injustice to the parties, but it is not upon this Court to search a seventeen-volume record and five cases of exhibits to find support in the record for this deduction, especially after the Court has called citation deficiencies to the attention of counsel
 
 
 [30]
 The payment bond furnished by the prime contractor, Williams and Dunlap, limits liability to persons having contracts directly with the prime contractor for labor or materials. See 1 Appendix, p. 74. Thus, even if McKerreghan's claims were meritorious, it is questionable whether or not he would be entitled to maintain an action on the payment bond since he had no contract with Williams and Dunlap. We note however that Williams and Dunlap are two of the partners in Williams, Dunlap and Young, the entity with whom McKerreghan contracted. Also, we note that the Miller Act provides a right of action on the payment bond to "sub-subcontractors" who have furnished timely and proper notice to the prime contractor. 40 U.S.C. § 270b(a)