**FRANK HORTON & COMPANY, Inc.,**
**Plaintiff-Appellee,**

**v.**

**COOK ELECTRIC COMPANY,**
**Defendant-Appellant.**

**Nos. 14965, 15019.**

United States Court of Appeals
Seventh Circuit.

Jan. 27, 1966.

Rehearings Denied March 7, 1966.

(En Banc).

1. Bowen v. Celebrezze, 250 F.Supp. 44.

Albert F. Manion, Thomas J. Johnson, Jr., Chicago, Ill., for appellant.

Patrick W. O'Brien, Chicago, Ill., George W. Hamman, Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel, for appellee.

Before DUFFY, CASTLE, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Cook Electric Company, a Delaware corporation with its principal place of business in Illinois, appeals from a judgment against it in the amount of $215,-758.76, growing out of a breach of contract action brought in the district court under diversity jurisdiction by Frank Horton & Company, Inc., a Missouri corporation. The plaintiff has filed a cross-appeal with respect to an element of damages.

The case was tried by the court without a jury. The facts as found by the district judge require considerable elaboration.

Frank Horton is the key figure in this lawsuit, both as an individual proprietor and as the controlling stockholder of the corporation bearing his name. In 1938, Horton organized Frank Horton & Company, a proprietorship originally engaged in consulting engineering which later added telephone wire installation to its activities. About 1954 Horton's proprietorship began to engage in the installation of underground communication cable. A special cable plow was developed for that purpose, patented, and assigned to the proprietorship.

Cook Electric Company at all relevant times had a division located in the Washington, D. C. area, the Advanced Communications Engineering Division (ACE). Clarence K. Laubach was the general manager of ACE and a divisional vice president of Cook. James W. Olsen was the assistant general manager of ACE.

In November, 1959, Cook was preparing to bid on government contracts for

the construction of communications systems at various Air Force missile sites, projects requiring the installation of many miles of underground cable. An ACE project engineer recommended that ACE consider Horton as a possible subcontractor for cable placement work. The engineer conducted a field examination of Horton's facilities in Lamar, Missouri, and reported that "the Horton organization" was capable of operating on a large scale. Horton thereafter met with Laubach and Olsen and at their request submitted bids for the cable-burying jobs at Forbes and Lowry Air Force bases. These bids were accepted and used by ACE, but Cook was unsuccessful in obtaining the prime contracts. During the discussion relating to the Forbes and Lowry projects, Horton informed Laubach and Olsen that he was in the process of forming a corporation to lay the cable at the missile sites should contracts be awarded.

Frank Horton & Company, Inc. was formed in February, 1960. The corporation had a stated capital of $1,000. Frank Horton became its president and owned ninety-six per cent of its stock. The corporation shared the same address with the proprietorship. It had no assets, its employees were former proprietorship employees, and it received all necessary funds through loans from Horton. In substance, the corporation was formed to do cable placement work on government projects through equipment –leasing from Frank Horton.

The liaison between Horton and ACE continued after the unsuccessful Forbes and Lowry construction bids. In June, 1960, Horton submitted subcontract bids for the missile site jobs at Lincoln (Nebraska), Larson (Washington), and Beale (California) Air Force bases. The bids were based in part upon estimates received from Horton employees who visited the job sites. The proposals submitted were personally prepared by Horton. They included lump sum figures for each base, followed by itemizations indicating the method used in their computation.

Horton delivered the bids, totaling $1,080,191.40 for the Lincoln, Larson, and Beale projects, to ACE in Washington, D. C. where he met Laubach and Olsen. He again informed them that he intended to have the corporation do the work, using his personnel and leasing his cable-burying equipment.[1] At one point Olsen remarked that "that method probably would have some tax advantage."

Cook received the Lincoln, Larson, and Beale prime contracts in August, 1960, using Horton's bids in its own proposals. Olsen promptly assured Horton that he would be awarded the subcontracts. Subsequently, Horton received a letter from Olsen dated September 9, 1960, and addressed to "The Frank Horton Company * * * Attention: Mr. Frank Horton, President." The letter stated in part:

This Letter of Intent is issued in anticipation of the execution of a definitive construction contract for cable placement and materials between the Cook Electric Company, represented by * * * [ACE] and the Frank Horton Company pursuant to which the Contractor shall furnish certain construction services and materials as may be required, in accordance with previously accepted fixed price offers by ACE * * * relative to the missile intercommunication systems for the Larson, Lincoln and Beale complexes. * * *

* * * * * *

It is contemplated that our contract with your Firm will be executed within 60 days. However, in order to meet the requirements of the time schedule, it is recognized that the necessary equipment readying and subsequent movement thereof to Site

---

1. The corporation performed its first cable-burying operation in this manner in August, 1960. The work was performed at Forbes Air Force Base, with Laubach's knowledge, for another contractor. The work was short-lived, however. A jurisdictional labor dispute forced the cancellation of the corporation's subcontract.

locations be taken at this time to insure prompt delivery of the cable construction services and materials in the amounts shown.

\* \* \* \* \* \*

Union labor will be required on the job, and the Contractor will be required to guarantee such work with the International Brotherhood of Electrical Workers at both International and Local levels.

\* \* \* \* \* \*

In accepting this Letter of Intent, it is understood that the Contractor is bound by the same terms and provisions governing ACE under Contract AF 30 (635)—19218.

\* \* \* \* \* \*

Please indicate your acceptance of the above terms by reply letter. Good luck—it is nice to get going.

Horton indicated his acceptance of the letter of intent on September 13. His letter was written on the stationery of Frank Horton & Company, Inc., the first time such stationery had been used in communications between the parties. The letter was initialled by Horton on behalf of the corporation. It noted that preparation for the work had begun and that men and equipment were moving to the Beale and Larson sites.

Horton visited Laubach and Olsen at the ACE offices in Washington on September 19. There he was given a letter, signed by Laubach as "Vice President, Cook Electric Company," reading in part:

Your letter proposal dated 26 July 1960 for work involved in placement of buried and submarine cables on the Missile projects has been evaluated and is acceptable by Cook Electric Company subject to the following:

1. Your fixed price for performance of this work remains unchanged. We understand that the fixed prices for each project is: Lincoln, $521,146.20; Lar-

son, $232,690.00; and Beale, $326,355.20.

\* \* \* \* \* \*

The Cook Electric Company has used your price proposal in its preparation of the Larson, Lincoln and Beale Projects. We hereby wish to inform you that we shall contract with you according to the terms of this Letter Amendment to our Letter of Intent referenced above.

It has been a pleasure working with you. Your efforts and expenditures of time and money in the preparation of your proposal is deemed to be good and sufficient consideration to support the statements contained herein.

Horton returned to his office in Missouri, where on September 23 he received a telegram from Laubach reciting the necessity of "firm local union agreements in writing \* \* \* by 29 September \* \* \* to meet USAF requirements by October 1." Horton, of course, was aware of the necessity of both international and local union agreements, and had already discussed the terms of a proposed agreement with a vice president of the International Brotherhood of Electrical Workers. He was not aware, however, of the urgency of such agreements.

Horton immediately set out in a frantic, nationwide quest to satisfy this obligation. While in Washington, D. C. in an effort to contact the president of the IBEW, he explained his predicament to Laubach. Laubach told him to "get the agreements as quickly as you can." Horton then visited the west coast and spoke to local union officials. On October 5, he called Olsen from Texas, where he had just obtained the final draft of the international agreement.[2] Olsen commented that "it looks like you'll make it," and added that a telegram had been sent to Horton's office in Missouri on the previous day giving Horton ten days in which to secure the union agreements. The telegram, which had been prepared by Washington counsel for Cook, was ad-

2. The agreement required the formal approval of the IBEW president.

dressed to "Mr. Frank Horton, Frank H. Horton & Company, Inc." and read in part:

> You are hereby notified that Frank Horton & Company, Inc. is in default under its agreement with Advanced Communications (ACE) Division of Cook Electric Company as evidenced by a Letter of Intent dated September 9, 1960, as amended by Letter of Amendment dated September 19, 1960, and an acceptance dated September 13, 1960; since such company has not furnished firm local union agreements as requested by telegram of September 22, 1960.

> Unless within ten days from the date hereof Frank Horton & Co., Inc. can perform under such agreement by guaranteeing union work with IBEW at both international and local levels, which guarantee shall be evidenced by it securing, producing and delivering to ACE firm written local union agreements for the Beale, Larson and Lincoln areas within such time, any and all agreements between Frank Horton & Company, Inc. and ACE shall be determined.
> * * *

Horton received the signature of the IBEW president on the international union agreement on October 7. By October 10, Horton also possessed commitments from the appropriate IBEW locals covering the Lincoln, Larson, and Beale projects. On the following day he presented the final two agreements to Olsen in Washington. Olsen remarked that "they meet our requirements. I am real glad that you got them." Horton returned to Missouri to proceed with the work.

As the district judge commented, however, "strange transactions were transpiring" during the period when Horton was so frantically endeavoring to secure the union agreements. On September 30, Olsen informed an ACE project engineer that the plans had changed, that Horton would not get the Beale project. A few days later Cook's labor relations manager told an IBEW local representative that the R. C. Hughes Electric Company would get the cable placement contract at Lincoln Air Force Base. And on October 5, the same day on which Horton was informed that he had ten days to secure the union agreements, ACE and the R. C. Hughes Electric Company, Inc.,—Cable Construction Company exchanged telegraphic offer, letter of intent, and acceptance for the cable placement at the Lincoln, Larson, and Beale sites. The contract price stated in these communications was $216,039.40 less than that bid by plaintiff.

On the day after Olsen had been presented with the evidence of local union agreements by Horton, October 12, Olsen wired the IBEW locals requesting confirmation that the "Frank Horton Company" had secured full working agreements with them and had settled certain potential jurisdictional problems. Two replies were received, one of which reluctantly acknowledged the existence of an agreement. The second reply, from a different union representative than the one who had given a "letter of acceptance" to Horton, stated that "this office has not settled anything concerning the cable job."

On October 18, Horton received a wire from Cook's Washington attorneys purporting to cancel any agreements which may have existed between ACE and "Frank Horton and Company" for failure to comply with the October 4 telegram. Three days later, Horton received assurance from an IBEW official in Washington that his international and local union agreements were in order. Neither Horton's proprietorship nor his corporation was allowed to proceed with the work. This suit by the corporation followed.

The district court held that a legally binding contract had been entered between the defendant, Cook Electric Company, and Frank Horton & Company, Inc. The court also held that Cook had terminated the contract without just cause, and assessed damages.

Cook first challenges the district court's finding that it entered a contract with the plaintiff corporation. Cook con-

tends that no definite offer and acceptance can be found, that all negotiations were preliminary to a later formal execution of an agreement. Secondly, Cook urges that no meeting of the minds occurred since it intended to contract with the Frank Horton proprietorship and not with a corporation bearing his name. These contentions must be rejected.

The evidence pointing to the existence of the essential elements of a contract has been stated. The letter of intent of September 9 from ACE contained all of the essential terms of a contract. It stated that the bids made by Horton on the Lincoln, Larson, and Beale projects had been accepted. It indicated the time, place, and manner of the work to be performed. The letter also incorporated by reference the terms of Cook's prime contract with the Government. The requirements of a performance bond and the employment of union labor were spelled out. Any possible confusion as to the agreed contract price was clarified by the letter handed to Horton on September 19.

■ Horton accepted the terms stated in the letters of September 9 and 19 by his reply letter of September 13, by his subsequent discussions with Laubach, and by his action in moving men and equipment to the job sites. It is true that the parties may have contemplated the execution of a formal agreement at a later date. But such fact does not render the earlier agreements mere negotiations where it is clear that the ultimate contract will be substantially based upon the terms then stated. Borg-Warner Corp. v. Anchor Coupling Co., 16 Ill.2d 234, 156 N.E.2d 513 (1958); Priest v. Oehler, 328 Mo. 590, 41 S.W.2d 783 (1931). We quote with approval a portion of the district judge's carefully considered opinion:

> The language of the letters, and the surrounding circumstances which were considered in interpreting the language, clearly indicate that these things did not constitute mere inoperative steps in preliminary negotiation. The acceptance of the letter

of intent evidenced a meeting of the minds as to all the substantive and essential terms of the relationship between the parties. The fact that defendant demanded the immediate commencement of performance is a strong indication that A.C.E. expected the letter of intent and acceptance thereof to become binding and effective immediately. Defendant certainly did not expect Horton to commence performance only upon a "hope" of obtaining a contract. Furthermore, the words "it is nice to get going" has an air of conclusiveness about it.

■ Cook's argument that no meeting of the minds occurred also runs contrary to undisputed facts found by the district court. Laubach and Olsen were informed on two occasions that the work would be performed by a corporation drawing upon Horton's proprietorship personnel and equipment. The letter of intent submitted by ACE was accepted by Horton on behalf of the corporation, and no objection was made. In addition the October 4 notice of default drafted by counsel retained by Cook was addressed to the corporation and threatened the corporation with cancellation of the contract.

All the evidence in the record points to the conclusion that it made no difference to Cook what type of entity Horton chose to conduct the cable-burying operation. The imprecision with which many communications were directed to Horton does not suggest a contrary inference in view of the fact that Laubach and Olsen were aware of Horton's intentions and did nothing to dissuade him. The mere fact that no mention of a "meeting of the minds" or "party" issue was made at the time Cook attempted to cancel the agreement indicates that the legal distinction between the proprietorship and the corporation was irrelevant to Cook. Cf., Rothweiler v. Callicott, 322 S.W.2d 151 (Mo.App.1959).

■ Cook's next argument is that its agent, Laubach, had no authority to bind

it to a million dollar subcontract.[3] Laubach had no such express authority.[4] But we agree with the conclusion of the district court that Laubach had apparent authority to enter such contracts, and we again quote from the district judge's opinion:

> Laubach, the agent, was a Vice-President of Cook. He was also head of the A.C.E. Division, with offices in a city removed from the home office and other divisions of Cook. The purpose of A.C.E. was to specialize in and serve the communications industry. Cook on a number of occasions ratified Laubach's contracts on behalf of the corporation and did so without demanding that he not sign such contracts prior to receiving their approval. In effect, Cook acquiesced in Laubach's manner of dealing and thereby permitted him to hold himself out as a principal.

The only person senior to Laubach in regard to the construction of communications systems for missile bases was the president of Cook. In fact, Laubach signed the contract with the firms which replaced the Horton corporation on the Lincoln, Larson, and Beale jobs, and this contract does not appear to have been either discussed or formally ratified by Cook's board of directors. Under these circumstances, Cook is now estopped to deny the authority of its agent. State ex rel. Massman v. Bland, 355 Mo. 17, 194 S.W.2d 42, 46 (1946).

■ The defendant contends that it was justified in cancelling its agreement with Horton because the latter failed to produce satisfactory union agreements as required by the letter of intent and the notice of default. The letter of intent required Horton to "guarantee" the work with the IBEW at both local and international levels. Subsequently, Horton was requested to secure "firm local agreements," and, by the terms of the notice of default, was given ten days to comply. Aside from the question of whether the timing of the requests by ACE was reasonable, we think that Horton substantially complied with the requests.

The international union agreement obtained by Horton is unchallenged. The terms of that agreement virtually assured the successful negotiation of the local agreements. The constitution of the IBEW provides that any local agreement which conflicts with an international agreement may be set aside by the international. Secondly Horton did secure "letters of assent" from two of the three local unions concerned and a "letter of acceptance" from the third. These letters themselves recognized the supremacy of the international agreement.

Cook's good faith in asserting the failure of the plaintiff to provide union agreements as the reason for its rescission of the contract is also open to question. As stated earlier, ACE made firm commitments to another subcontractor for the Larson, Lincoln, and Beale cable-burying jobs only one day after it had given Horton ten days to secure the union agreements. The district court found that "A.C.E. clearly appears to have been attempting to get rid of plaintiff and have other subcontractors do the cable placement work at a lower price. The contention that Horton had failed to secure firm local agreements was an attempt by A.C.E., through its Washington, D. C. attorneys, to provide a legal basis for rescinding the contract." Cook has significantly failed to contest this statement.

■ Finally, Cook contends that the district court erred in its computation of damages. The court based its findings

---

3. It should be noted that Cook's failure to assign lack of authority as a reason for terminating the Horton contract and its failure to plead want of authority as an affirmative defense are indications of the tenuousness of its present position.

4. Cook's board of directors expressly withdrew such authority from divisional vice presidents by a resolution adopted on October 6, 1959.

on the "benefit of the bargain" formula. Horton's accepted bids were used as the contract price. The sum of the expenses which would have been incurred in performing the contract and the expenses which had actually been incurred pursuant to the contract was subtracted from this price to obtain the estimated lost profit. The actual expenses incurred were then added to the estimated lost profit to arrive at the final damage figure. We think the formula chosen by the district judge was proper. 5 Corbin, Contracts 195 (1964).

Cook argues that in adopting this method, the court ignored a specific formula for the ascertainment of damages contained in Cook's prime contract with the Government, to which the subcontract was subject. The imposition of this formula, Cook says, would restrict the plaintiff's damages to its out-of-pocket expenses. But the provision cited by Cook in support of its argument applies only when the subcontractor "fails to perform" in accordance with the contract. Since the plaintiff was not in default under its contract, the provision cited by Cook has no relevance.

The court allowed $39,840.92 for out-of-pocket expenses. Cook has challenged individual items aggregating approximately $5,000. The district judge carefully considered the testimony of a former employee of the plaintiff and an accountant who testified for Cook. He then allowed certain expenses and disallowed others. His findings as to the expenses which were allowed are supported by the record.

The plaintiff's lost profit was set at $175,917.84. In arriving at this figure, the court considered a rough cost estimate prepared by Horton in November, 1960, a more detailed estimate also prepared by Horton in January, 1963, and Horton's own testimony. Cook argues that the detailed estimates should not have been admitted as the summaries of an expert because the estimates were self-serving and because Horton did not sufficiently explain the manner in which the work would have been performed.

The court, however, expressly recognized the self-serving nature of the cost estimates. It adjusted the estimates upwards in many instances, and chose to credit Horton's calculations in other instances. Cook did not offer an expert on the lost profit issue, but cross-examined Horton extensively. In view of the nature of the work to be performed, we think that the district judge properly admitted Horton's cost memoranda. Horton's calculations provided the best method of proving lost profit which could have been adopted.

This brings us to a consideration of the question presented by the plaintiff's cross-appeal. The plaintiff contends that its claim for $25,076 as an out-of-pocket equipment rental expense should have been granted. The equipment referred to is the cable-burying machinery which was shipped to the Larson and Beale job sites pursuant to the defendant's request in its letter of intent. The district court did not allow this claim essentially because the plaintiff failed to prove that it paid anything for the use of the equipment or that it was legally obligated to do so.

The plaintiff did not establish that Frank Horton, the owner of the equipment, ever submitted a bill to Frank Horton & Company, Inc., the plaintiff, for the rental or lease of the equipment. Nor did the plaintiff establish that it either reimbursed Frank Horton for such rental or recognized an indebtedness to him on its books. Thus, no "actually incurred" equipment rental expense was proved.

The plaintiff argues that the absence of formal negotiations between Horton and his alter ego should not inure to the benefit of the defendant. The plaintiff says that since it complied with the defendant's request to ship the equipment, and since $25,076 was shown to be the fair rental value of the equipment, a claim in quantum meruit has been established. We do not agree. To establish such a claim it was necessary for the plaintiff to show either a benefit received by the defendant or a loss incurred

by plaintiff. It is conceded that the equipment shipped to the Larson and Beale sites was never used. Thus the defendant received no benefit from the requested performance. And although the fair rental value for the equipment for a two month period,[5] $25,076, was not disputed, the plaintiff made no attempt to show that the equipment was in demand or that it would have been used on another job had the defendant not requested it. To permit the plaintiff to recover such fair rental value absent a showing of actual expense or other detriment to the plaintiff would constitute a penalty rather than recompense.

In summary, our examination of the record in this case reveals no error in the findings embraced in the opinion filed by the district judge. Moreover, we are convinced that the judge applied the proper legal principles to the facts.

The judgment is affirmed.

---

5. The plaintiff attempted to show that the equipment was tied up in connection with the Beale and Larson projects from September 15 to November 15. The supporting freight billings ranged from September 22 to November 9, and the district court properly characterized the remainder of the evidence on this question as "unclear."