**TENNISLAND, INC., Plaintiff,**

v.

**PRECISION TENNIS SYSTEMS, INC., and Vladimir Kranz, Defendants.**

**Civ. A. No. 75–1598.**

United States District Court, W. D. Pennsylvania.

July 21, 1977.

William S. Hays, Pittsburgh, Pa., for plaintiff.

Ronald H. Heck, Pittsburgh, Pa., for defendants.

## OPINION

MARSH, District Judge.

This is a breach of contract action. Jurisdiction is founded on diversity of citizenship. The case was presented to the court in a two-day non-jury trial.

The court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The plaintiff, Tennisland, Inc. (Tennisland), is a Pennsylvania corporation having its principal place of business in Castle Shannon, Pennsylvania.

2. Tennisland's principal officers are Rocco V. Ragano and Joseph P. Moses.

3. The defendant, Precision Tennis Systems, Inc. (Precision), is a New York corporation with its principal place of business in New York City.

4. Defendant Vladimir Kranz is the president of Precision. He has been Precision's only officer and sole shareholder since August, 1974.

5. On September 22, 1975, Tennisland ordered three air structures and related equipment from Precision. The structures were to cover three existing outdoor tennis courts located on Tennisland's property in Castle Shannon so that the courts could be rented for indoor tennis during the cold weather months. The structures were designed so that after installation they could be dismantled in one day and stored in a garage during the outdoor tennis season.

6. The terms of the order are spelled out in Tennisland's letter of September 22, 1975, which was dictated by Ted Weiner, Precision's sales representative. The letter states: "Precision agrees that upon approval of order, installment will be complete prior to November 15, 1975."

7. Precision's letter of confirmation dated October 2, 1975 makes no mention of a completion date. The letter indicates that Precision would assist Tennisland in securing a five-year leasing agreement. If Tennisland did not secure financing approval "within the immediate period," Precision itself would handle the financing so long as certain listed conditions were fulfilled by Tennisland, including: (1) that Tennisland send Precision a deposit in the form of a $10,000 certified check; and (2) that Tennisland furnish Precision with the "necessary collateral to secure the air structure lease", including personal guarantees of the lease by the owners of Tennisland.

8. On October 7, 1975, Tennisland sent a certified check for $10,000 to Precision.

9. The total cost for the purchase, delivery, and installation of the air structures with all related equipment was $73,146.00. This includes $4,000 worth of installation labor to be provided by Precision.

10. On October 16, 1975, Ted Weiner, Precision's sales representative, wrote to Tennisland that preparation of various materials was:

"   .   .   .   proceeding according to schedule so that we can help you with your November 15th opening date.

"So far, everything is in order from a manufacturing point of view, and the only thing which remains undone is the

finalizing of your leasing approval which is being processed since we received your approval yesterday. I am pleased at the progress at this time, so please don't worry about anything . . . ."

11. Between September 22, and October 20, 1975, Precision made calls to Tennisland requesting that Ragano and Moses send to Precision property appraisals, financial statements, and personal guarantees of the proposed lease. By October 22, 1975, Precision had received the requested items.

12. On October 21, 1975, Dennis Popp and Fred Popp, employees of Precision, arrived at Tennisland to assist for two days in laying out the anchoring system required for the air structures.

13. On October 27, 1975, Ragano, Inc., a construction company owned by Rocco Ragano, completed drilling the holes and digging the trenches needed to anchor Precision's air structures.

14. On October 28, 1975, Precision wrote an invoice to A.I.D. Leasing of Philadelphia because A.I.D. Leasing had approved the financing for the Tennisland lease.

15. On October 27, 1975, Weiner told Ragano in a telephone conversation that Dennis Popp would be leaving New York the next day with a truckload of anchors. Popp arrived at Tennisland on October 29 with five anchors.

16. On October 29, Popp told Ragano that Precision could not complete installation of the air structures by November 15. Popp told Ragano that the rest of the anchors were being manufactured and that much of the equipment had not been ordered by Precision. In a telephone conversation later that day, Weiner told Ragano that the furnace and lights required for the air structures had not been ordered and that the anchors had not been made.

17. On November 5, 1975, Moses arrived unannounced at Precision's office in New York in an effort to substantiate the statements about Precision's shortage of equipment.

18. While in New York, Moses was told by Weiner that the only available equipment consisted of three harness-type systems which fit over the air structures, and that two of these systems were damaged. Moses met Precision's bookkeeper, Mr. Horak, and was shown purchase order receipts indicating that Precision had ordered one furnace, one standby generator, some plastic, and some lighting fixtures. Moses found no indication on the receipts that the items which had been ordered were identified with the Tennisland job, which required three complete air domes and three complete heating units. Moses called one of Precision's lighting suppliers and was told that Precision's order could not be delivered for six to eight weeks. Moses then asked Weiner to give him the $10,000 worth of equipment Tennisland had paid for with its certified check of October 7. Weiner said he could not do this because he did not know where the equipment was located.

19. Other than the five anchors delivered on October 29, Precision never delivered or installed the air structures or any of the related equipment ordered by Tennisland.

20. On November 17, 1975, Vladimir Kranz wrote to Tennisland stating that all of the main parts were ready for delivery and that anchoring and installation could begin immediately. Tennisland then sent a mailgram to Precision on or about November 20, cancelling Tennisland's order.

21. Between November 10 and November 15, Tennisland contacted Cid Air, Incorporated, another air structure manufacturer, and purchased a single air structure designed to cover three courts. The Cid Air structure was delivered, installed, and in operation on Tennisland's premises by November 29, 1975.

22. The total cost of the Cid Air structure with related equipment and labor supervision was $71,000.

23. Under the purchase agreements with both Precision and Cid Air, Tennisland was to drill the holes and dig the trenches required for anchoring the air structures.

24. Ragano testified that Tennisland was charged $5,566 by Ragano, Inc., for

drilling the holes and digging the trenches needed for Precision's anchoring system. Tennisland paid Ragano, Inc., only $1,925. Ragano testified that Tennisland spent $3,719 renting various tools and equipment needed by Ragano, Inc., in order to drill the holes and dig the trenches for Precision's anchoring system.

25. The holes drilled and trenches dug for Precision's anchoring system served to decrease the amount of work which needed to be done for Cid Air's anchoring system, but the record does not indicate the extent of this decrease.

26. Tennisland had booked indoor tennis customers for the two-week period of November 15 to November 29, 1975. Since Tennisland could not provide these customers with indoor tennis until November 29, Tennisland lost indoor court rental income totalling $3,036.98.

27. Precision has never returned Tennisland's $10,000 deposit.

28. Ted Weiner did not testify as a witness at the trial.

## CONCLUSIONS OF LAW

1. The applicable law for this diversity action is Pennsylvania law, specifically Articles 1 and 2 of the Uniform Commercial Code, 12A P.S. §§ 1–101 to 2–725.

2. A valid contract between Tennisland and Precision was created not later than October 7, 1975. 12A P.S. §§ 2–207(1), 2–207(2), 2–204(2).

3. Under the contract, Precision promised to complete installation of the air structures by November 15, 1975, provided that financing for the sale was approved. 12A P.S. § 2–309(1). *Cf.* 12A P.S. § 2–309, Comment 6 ("Effective communication of a proposed time limit calls for a response, so that failure to reply will make out acquiescence.").

4. Upon the approval of financing for the Tennisland sale on October 28, Precision's promise to complete installation of the air structures by November 15 became an unconditional obligation. 12A P.S. § 2–301.

5. The representations made by Precision's employees Popp, Weiner, and Horak to Ragano and Moses from October 29 to November 5 constituted an overt communication of an inability to complete installation by November 15 and amounted to a repudiation of the contract under 12A P.S. § 2–610 (Comment 1). See *Bonebrake v. Cox*, 499 F.2d 951, 960–962 (8th Cir. 1974).

6. Precision's anticipatory repudiation justified Tennisland's negotiation of a substitute purchase order with Cid Air between November 10 and November 15. 12A P.S. §§ 2–610; 2–712.

7. Precision's failure to deliver and install the air structures by November 15 constituted a breach of the contract. 12A P.S. § 2–601.

8. Precision's anticipatory repudiation and its subsequent breach justified Tennisland's cancellation of the contract on November 20. 12A P.S. §§ 2–611(3), 2–711(1), 2–106(4).

9. Any delay by Tennisland in sending financial information requested by Precision was not so unreasonable as to relieve Precision of its obligation to complete installation by November 15. 12A P.S. §§ 2–311(3)(a), 1–204(3).

10. Precision's letter to Tennisland dated November 17 cannot serve as a retraction of Precision's earlier repudiation because it was written two days after Precision's performance was due under the contract. 12A P.S. § 2–611(1).

11. Precision's counterclaim against Tennisland for cancelling the contract is groundless. 12A P.S. §§ 2–611(3), 2–711(1), 2–106(4).

12. Tennisland is entitled to the return of its $10,000 deposit. 12A P.S. § 2–711(1).

13. Tennisland is not entitled to any damages for "cover" under 12A P.S. §§ 2–711(1)(a) and 2–712, because Tennisland received from Cid Air a substitute air

structure, related equipment, and installation labor for $2,146 less than the contract price with Precision.

14. Tennisland will not be awarded any compensatory or "incidental" damages for the expenses of drilling the holes and digging the trenches, and the expenses of renting tools and equipment. Some portion of that expense represents work done on perimeter trenches which were ultimately used for Cid Air's anchoring system. This work reduced Tennisland's costs under the contract with Cid Air. From the limited factual record before the court,[1] however, it is impossible to determine with any exactness the extent to which the Cid Air structure was able to make use of the work done for the Precision structure. Once the costs of work on the perimeter trenches proved necessary under the Cid Air contract, these costs lost their character as "damages" under 12A P.S. § 2–715(1).

15. Tennisland is not entitled to any compensatory damages for the costs of refilling and resurfacing the trenches between courts. Since a dollar figure for these costs has not been provided by Tennisland, there is no basis upon which to award any damages. 12A P.S. §§ 2–715(1), 1–106(1), and Comment 1 to § 1–106.

16. Tennisland is entitled to $3,036.98 in consequential damages under 12A P.S. § 2–715(2)(a) for lost court rental income from November 15 to November 29. Precision had reason to know at the time of contracting that Tennisland would lose indoor court rental income if Precision did not deliver and install the air structures by November 15.

17. Tennisland is not entitled to any prejudgment interest on its damage awards. *Hussey Metals Div. v. Lectromelt Furnace Div.*, 417 F.Supp. 964, 967–968 (W.D.Pa.1976).

1. There is a total absence from the record of checks, bills, receipts, account books, or other documentary evidence indicating what Tennisland spent drilling the holes, digging the trenches, and renting the tools and equipment.

18. The issue of whether or not Precision's corporate veil should be pierced so that Vladimir Kranz may be held personally liable need not be decided. Under the law of New York, Precision's state of incorporation, creditors of a corporation have no recourse against individual stockholders until they have recovered: (1) a judgment against the corporation; *and* (2) return of an execution on the judgment wholly or partially unsatisfied. *Eskimo Pie Corporation v. Whitelawn Dairies, Inc.*, 266 F.Supp. 79, 82–83 (S.D.N.Y.1967). Failure to obtain a judgment against the corporation and the return of an execution unsatisfied may be excused if the corporation is bankrupt or "notoriously" insolvent, or if a strong public interest is involved. The record contains no indication that Precision is bankrupt or "notoriously" insolvent and there is no strong public interest involved in this private dispute between two small corporations.

An appropriate order will be entered.

See *Frank Horton & Co. v. Cook Electric Co.*, 356 F.2d 485, 492 (7th Cir. 1966); *Autrey v. Williams and Dunlap*, 343 F.2d 730, 747 (5th Cir. 1965).