235 N.J. Super. 522 (1989)
563 A.2d 465
NEPTUNE RESEARCH & DEVELOPMENT, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
TEKNICS INDUSTRIAL SYSTEMS, INC., AND TEKNICS SALES CORPORATION, BOTH NEW JERSEY CORPORATIONS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 1989.
Decided August 24, 1989.
*524 Before Judges KING, BRODY and ASHBEY.
Samuel D. Bornstein argued the cause for appellants.
Albert B. Jeffers argued the cause for respondent.
The opinion of the court was delivered by KING, P.J.A.D.
This is a commercial dispute arising from the sale of a specialized manufacturing machine. This case turns on the issues of the seller's anticipatory breach and its later attempted retraction of that repudiation. We conclude that the buyer had the absolute right to cancel in view of the seller's repudiation. We affirm.
The buyer sued in the Law Division, demanding return of its $3,000 deposit plus interest and costs, alleging proper cancellation *525 because the seller failed to make timely delivery. The seller answered and counterclaimed seeking the balance of a 15% contractually-established cancellation price. After a bench trial, Judge Russell found for the buyer and dismissed the counterclaim.
These are the facts. The evidence in this case consisted principally of the written contract and the testimony of Akos Sule, buyer's founder, president and majority shareholder, of Paul Ng, buyer's general manager and Sule's second-in-command, and of Dave Robertson, one of seller's owners. The facts were not in substantial dispute, although there was one minor difference of opinion.
Buyer manufactured solar-operated valves used in scientific instruments. The machine involved is a Model RC-520 triple access Precision Vertical Machining Center which is used to drill holes in components with the very high degree of accuracy required by buyer. Sule saw the machine advertised in a trade journal and, believing that it was ideal for buyer's needs, contacted seller in late March or early April 1986. Following negotiations with seller's president, Ed Shepler, and an inspection of seller's facility, Sule placed an order on April 22, 1986.
The purchase price was approximately $55,000. The parties agreed to a mid-June 1986 delivery date, Shepler believing at the time that the machine was then in transit from Japan. Although the writing specified a mid-June delivery date; there was no clause stating that time was of the essence of the contract. Each page of the contract had printed language stating: "Cancellation charge 15 percent of total purchase price." Sule was aware of this provision. Printed "boiler plate" language in the standard terms and conditions of the sale dealt with delivery terms. Among other things, paragraph 5 of the standard terms and conditions stated that shipping dates were approximate, and that the seller would not be liable for delays which were caused by circumstances beyond the seller's control, such as fire, flood, strikes, or acts of God.
*526 In early June, Sule instructed Ng to call seller about the delivery date. Ng testified that from June onwards he made a number of telephone calls and got noncommittal or evasive responses. Robertson testified that after the sale was negotiated seller discovered a design deficiency in the machine and redesigned it in order to make a better product. However, there was no evidence that Robertson informed Sule or Ng of the alleged reasons for the delay.
By late August, buyer was in desperate need of the machine, although it is not clear whether this was communicated to seller. On August 29, Sule went to seller's place of business to examine the product, which was then in the process of being assembled. The machine was essentially the same as that ordered by Sule, except that it no longer had a linear ballbearing raise which Sule had thought was an attractive aspect.
Nonetheless, Sule agreed to take it. He, Shepler and Robertson agreed that seller would have the machine ready on September 5. Robertson promised to call Sule on September 3 so that Sule could have two days to arrange for his truckers to pick up the product.
Robertson did not call Sule on September 3. The next day, September 4, Sule told Ng to find out what was happening. Ng testified that he had three conversations with Robertson. According to Ng, during the first conversation Robertson told him that under "no circumstances" would seller be able to get the machine ready for pickup on September 5. Rather, the machine could be picked up at the earliest on September 9 or September 10. Ng reported this information to Sule, who then decided to cancel because he was "fed up" with the course of dealing and no longer had faith in seller. At Sule's direction, Ng telephoned seller and informed Robertson and the office manager, Lorraine Mercier, that buyer was cancelling the order and that the contract was void because of the extraordinary delay in delivery and seller's failure to be truthful with buyer. Ng also asked for the return of the deposit. The third phone call took *527 place about an hour later, when Robertson stated that the machine could be ready by the next day. Ng responded, "Thank you, but no thanks."
Robertson testified that only two conversations occurred on September 4. During the first, Robertson advised Ng that the machine would not be ready the next day, but might be available about five days later. Ng responded that he would relate that information to Sule. Within an hour Ng called back and the following conversation took place:
The second conversation, they had called me  Mr. Ng had contacted me back and had  we started discussing that he wanted an earlier delivery and at that point, we had discussed that for a Friday delivery and of the Friday delivery there, he says, well, I'll have to check with Mr. Sule because Mr. Sule at this point would like to cancel the machine.
So he had set the phone down and I assume he set it down, I could hear in the background Mr. Sule saying, no, I do not want the machine and then Mr. Ng had come back to the phone and had said that, no, Mr. Sule has decided he does not want the machine even if it is available for tomorrow and at that point, I'd indicated that may be a cancellation charge.
By letter dated September 4, 1986, addressed to seller's office manager, Sule confirmed that buyer no longer wanted the machine and expected the return of its $3,000 deposit. Robertson claimed that the machine was in fact ready to be picked up on September 5. The parties thereafter attempted to resurrect the transaction, but the terms proposed by buyer and its attorney were not acceptable to seller. Buyer then filed this law suit a few weeks later.
At trial, seller argued that, assuming Robertson's statements on September 4 amounted to an anticipatory breach, the breach was not material, and thus buyer could not cancel because the machine was, in fact, ready for delivery on the date promised, September 5. Buyer, on the other hand, contended that the agreed upon September 5 delivery date had to be viewed in the context of the original delivery date of mid-June. Buyer's counsel also theorized that the machine that was shown to Sule on August 29 was different enough so that the agreement to accept that machine amounted to a new contract.
*528 Judge Russell interpreted the Uniform Commercial Code as requiring strict conformance with the time of delivery provisions in sales contracts, unlike other contracts in which untimely performance may or may not be a material breach. Thus, seller's failure to deliver the machine in mid-June 1986, as called for in the contract, entitled buyer to cancel. However, buyer agreed to accept a substitute machine provided it was delivered on September 5, 1986. According to the judge, the discussions on August 29 could be viewed either as a new contract or as an amendment to the prior contract. But the crucial fact, according to the judge, was that buyer cancelled after seller stated that delivery could not be made on September 5, and seller's subsequent attempt at agreement or to provide delivery on September 5 occurred after buyer had cancelled. Her precise findings on the critical point were that:
There's a substantial dispute as to what happened on September 4th, various phone calls and so forth, but it's not disputed that in response to buyer's inquiry calls that the seller's employee represented the substitute machine could not be delivered on September 5th.

....
Now, it's not disputed that upon the indication that it would not be timely delivered on September 5th that the purchaser rescinded. Purchaser was entitled to cancel and rescind at that time and was not obligated to accept nonconforming goods beyond the final of the original delivery date. [Emphasis supplied.]
The judge found that upon seller's breach, buyer was entitled to the return of its deposit, and that seller could not collect the 15% cancellation charge sought by the counterclaim.
Seller contends that the trial judge mistakenly interpreted the Uniform Commercial Code. According to seller, § 2-508(1) of the Code allows a seller to cure any nonconformities. Seller contends that the same result follows under general contract law. According to seller, its announcement on September 4 that it could not deliver in time was not an anticipatory breach because it was not material. Seller contends that failure to timely perform is not ordinarily a material breach and a buyer cannot cancel on this basis.
*529 Buyer contends that seller committed an anticipatory breach on September 4 by stating that it would not have the machine ready by the next day, as the parties had previously agreed. Buyer urges that the cure remedy was not available to seller because the goods had not been delivered and then rejected.
We disagree with seller that it had a right to cure. Seller relies on N.J.S.A. 12A:2-508(1), which states:
Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.
The purpose of this provision is to ameliorate the often harsh results under pre-Code sales law, which required performance that complied in every respect with the contract. Ramirez v. Autosport, 88 N.J. 277, 284 (1982). Over the years courts modified the "perfect tender" rule by allowing rescission for material breaches only. Under the Code, the buyer can reject goods for any nonconformity but rejection does not equate to a right of cancellation or rescission; rather, the seller may cure under § 2-508. Id. at 285.
The express language of § 2-508 shows its inapplicability here. That provision speaks of a tender or delivery which is rejected because it is nonconforming. In other words, this section "specifies the extent to which a seller who has made a nonconforming tender which has been rejected may replace the original tender with a substitute tender within the original contract period, or within a reasonable time after the expiration of such period." 3 Anderson, Uniform Commercial Code (3 ed. 1983), § 2-508:3 at 664. In the present case, buyer cancelled the contract before seller got around to tendering or delivering the goods. Buyer never rejected the machine. Buyer here simply claims that there was no contract in existence at the time seller was supposed to deliver.
What we then have is a repudiation by seller that allegedly amounted to an anticipatory breach, followed by a retraction. The Code prescribes specific rules for this kind of situation *530 which are similar in many respects to the rejection-cure provisions, but which in some respects are different. N.J.S.A. 12A:2-610, entitled "Anticipatory Repudiation," states that when "either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may ... resort to any remedy for breach." One of the remedies available to a buyer is cancellation, N.J.S.A. 12A:2-711(1), which occurs "when either party puts an end to the contract for breach by the other." ... N.J.S.A. 12A:2-106(4). However, the Code permits a party to retract an anticipatory repudiation under some circumstances. Specifically, N.J.S.A. 12A:2-611(1) states:
Until the repudiating party's next performance is due he can retract his repudiation unless the aggrieved party has since the repudiation cancelled or materially changed his position or otherwise indicated that he considers the repudiation final.
In our opinion, § 2-610 and § 2-611 govern here. The key questions are: (1) did seller in fact repudiate when Robertson stated that the machine could not possibly be ready by September 5, and (2) should seller be allowed to retract its repudiation because buyer did not change its position for the worse?
Implicated in the first question are whether a statement that the seller cannot deliver on time is a repudiation, and, on these facts, whether such a statement substantially impaired the value of the contract to buyer. The Uniform Commercial Code comment to § 2-610 states that the "most useful test of substantial value is to determine whether material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated." Section 2-610 expresses preexisting New Jersey case law. See New Jersey study comment to N.J.S.A. 12A:2-610. There are some helpful, though not dispositive, extant cases.
Our Supreme Court offered a useful definition of anticipatory repudiation in Ross Systems v. Linden Dari Delite, Inc., 35 N.J. 329 (1961), as follows:

*531 An anticipatory breach is a definite and unconditional declaration by a party to an executory contract  through word or conduct  that he will not or cannot render the agreed upon performance. [Citations omitted]. If the breach is material, i.e., goes to the essence of the contract, the non-breaching party may treat the contract as terminated and refuse to render continued performance. [Citation omitted; 35 N.J. at 340-341.]
We find no modern support for the trial judge's view that defendant's failure to make delivery in mid-June 1986 in itself constituted a repudiation, or material breach, and immediately entitled plaintiff to cancel. The contract had no "time-of-the-essence" clause and there was nothing in the surrounding circumstances to indicate that the initial time of performance was essential.
The Code leaves it to the parties to agree on time requirements; in the absence of an agreement the Code will imply a provision in the contract requiring delivery within a reasonable time. N.J.S.A. 12A:2-309(1). A court's function is to determine whether and when it was the intention of the parties to make timely performance a vital feature of the contract. Koolvent Aluminum Awning Co. of N.J. v. Sperling, 16 N.J. Super. 444, 446 (App.Div. 1951). If time was of the essence then the breach was material and plaintiff had a right to cancel. Id. at 447; Kahle v. Amtorg Trading Corporation, 93 F. Supp. 405, 407 (D.N.J. 1950); see also Vinen Corporation v. Alan W. Nau Contracting, Inc., 232 N.J. Super. 589, 595 (App.Div. 1989).
A contract does not need to expressly state that time is of the essence in order for timely delivery to be deemed essential. Koolvent, 16 N.J. Super. at 447. A failure to deliver within the prescribed time may justify the buyer in cancelling. Likewise, an announcement by the seller to the buyer that he cannot deliver in time may be a repudiation under § 2-610. Tennisland, Inc. v. Precision Tennis Systems, Inc., 437 F. Supp. 339, 343 (W.D.Pa. 1977).
While a seller's statement that delivery will be untimely may be a repudiation, it does not have to be. According to Ross *532 Systems, the question is whether the breach is "material." 35 N.J. at 341. The Code uses different language, i.e., whether the repudiation substantially impairs the value of the contract, § 2-610, but it does not define that phrase and we think it reasonable to treat interchangeably that phrase and the materiality standard of Ross Systems. The Restatement sets forth flexible criteria for determining whether a breach is material, as follows:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.
[2 Restatement, Contracts 2d, § 241 at 237 (1981).]
We think under the circumstances here one could reasonably find that seller's repudiation went to the essence of the contract. Defendant had agreed to a mid-June delivery. Throughout the summer it not only failed to deliver, but it refused to explain its reasons for non-delivery or to give plaintiff adequate assurances that the machine would be delivered soon, Cf. N.J.S.A. 12A:2-609(1) (entitling a party to suspend performance under some circumstances if the other party fails to give adequate assurances). By late August buyer, according to Sule, was in desperate need of the machine. On August 29, Sule learned that the machine buyer bought was no longer available because seller had changed the design. We conclude that buyer readily could have cancelled at that point but it did not. Rather, Sule agreed to accept the modified machine but only on the express condition that seller have the product available by September 5.
While Sule did not expressly state to any of seller's representatives that time had now become of the essence, we conclude *533 this condition can fairly be implied, from the surrounding circumstances. Buyer had already waited a long time, seller had not been candid with buyer, and Sule had good reason to believe that seller would not perform. In essence, the events of August 29 can be viewed as Sule giving seller "one last chance." Seller's failure to call buyer on September 3, as seller had promised to do, could have only deepened buyer's suspicion that seller was not going to perform. In light of these circumstances, Robertson's unequivocal statement on September 4, that under no circumstances would the machine be ready by the promised delivery date, September 5, was a repudiation going to the essence of the contract.
The factors set forth in § 241 of the Restatement are only illustrative. Those factors are "to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." 2 Restatement 2d, at § 241, Comment (a) at 237-238. Factors (c), (d), & (e) are especially relevant here. Seller, the party which failed to perform, suffered no forfeiture as a result of plaintiff's cancellation; seller still has the machine. By September 4, buyer had every reason to believe that seller would not cure its failure. Finally, one has to question on this record whether seller acted in good faith between mid-June and September 4.
We conclude that Robertson's statement on September 4 constituted an anticipatory repudiation within the meaning of § 2-610. The remaining question is whether Robertson's offer later that day to make the machine available for delivery on the agreed-upon September 5 date amounted to an effective retraction of the repudiation within the meaning of § 2-611(1). That section allows a repudiating party to retract if performance is not yet due unless the nonbreaching party has "since the repudiation cancelled or materially changed his position or otherwise indicated that he considers the repudiation final."
*534 The disjunctive language of § 2-611(1) is key. Pre-Code authority is somewhat ambiguous on whether a buyer must change his position for the worse in order to preclude a seller from retracting a repudiation. Williston is unclear. 11 Williston, Contracts (3 ed., 1968), § 1335 at 180-183. Corbin likewise is somewhat uncertain, but seems to hold that the nonbreaching party must change its position for the worse in order to preclude a retraction. 4 Corbin, Contracts (1951), § 980 at 935. Corbin states:
In the case of the repudiation, it has sometimes been said that it becomes a final and irrevocable breach as soon as the other party expresses his assent to it as such. It is believed, however, that this statement is erroneous. In the cases in which such a dictum is found, either the court found that there had been no such expression of assent and proceeded to hold that there was no anticipatory breach, or the expression of assent by the injured party was accompanied by a material change of position on his part. The bringing of an action for damages is, of course, such a change of position. It is believed that, in spite of the mere words `I assent to your repudiation as final,' the repudiator continues to have the power of retracting his repudiation as long as the other party's position has not been materially changed and as long as there has been no breach by actual non-performance at the time fixed for such performance by the contract. [Ibid.]
One pre-Code New Jersey case addresses the issue in dictum, and tentatively expresses the view that the standards might be different depending upon whether the nonbreaching party seeks damages or merely asks to rescind. Miller and Sons Bakery Co. v. Selikowitz, 8 N.J. Super. 118, 123 (App.Div. 1950), states:
There is another rule relating to anticipatory breaches that has not been brought into the case by the pleadings, or request to charge, or otherwise, and which has not been argued before us but which we will mention in order not to seem to discard it by silence. An anticipatory breach is nullified as the basis of an action for damages, if the repudiation of the contract is withdrawn before the injured party brings his action or otherwise materially changes his position. [Citations omitted.] Whether it is nullified as the basis of rescission if the repudiation is not withdrawn until after the opposite party has manifested his election to rescind, is doubtful. [Citations omitted.]
We have found no helpful cases construing § 2-611(1), but we assume that the drafters intentionally used the disjunctive: that is, the breaching party loses the right to retract if the *535 nonbreaching party materially changes his position or cancels. The cognate provision in the Restatement of Contracts states:
The effect of a statement as constituting a repudiation under § 250 or the basis for a repudiation under § 251 is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final. [2 Restatement, Contracts 2d, § 256 at 293.]
The Comment explains:
Once the injured party has materially changed his position in reliance on the repudiation, nullification would clearly be unjust. In the interest of certainty, however, it is undesirable to make the injured party's rights turn exclusively on such a vague criterion, and he may therefore prevent subsequent nullification by indicating to the other party that he considers the repudation final. [Id., Comment c. at 294-295.]
In the present case, buyer did not change its position for the worse prior to retraction, at least in the sense of either filing suit or getting a replacement machine. Buyer clearly had no time to do that, since seller attempted to retract its repudation within an hour. The question before us is whether buyer's cancellation stands despite the absence of prejudice and seller's nearly immediate retraction. We can find no case which addresses a similar situation.
Under the facts before us, we give effect to buyer's cancellation. We reach this result for three reasons. First, the express language of § 2-611(1) permits cancellation and bars retraction even in the absence of prejudice. Second, the certainty interest expressed and found in the Restatement is, in this instance, persuasive. Third, we cannot ignore seller's previous, less-than-exemplary conduct. Corbin makes the point that if "substantial performance of the contract requires the maintenance of a relation of trust and confidence between the parties and the repudiation is of such a character as to shatter this relation beyond repair, the repudiation in itself creates such a change of position as to prevent retraction." 4 Corbin, § 980 at 932.
This was such a relationship. Seller was supplying an expensive, complex "high-tech" machine which, presumably, was *536 important, if not essential, for the success of buyer's business enterprise. Seller was to supply installation services and train two operators as part of the contract. The machine was sold with express warranties. Such a machine would require periodic maintenance and repair, services which seller must perform under the terms of the express warranty. Indeed, the written contract itself contains a statement that seller looked forward to a "long and prosperous relationship." Seller's repudiation, which followed a series of deviations from the terms of the contract, was in a real sense "the straw that broke the camel's back." We find buyer reasonably concluded that it could no longer rely upon seller. The cancellation by buyer was justified.
Affirmed.