**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0157n.06
Filed: February 28, 2006

**No. 04-6377**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

NETWORK HEALTH SERVICES, INC.,       )
                                      )
       *Plaintiff-Appellant,*       )
                                      )      ON APPEAL FROM THE UNITED
v.                               )      STATES DISTRICT COURT FOR
                                      )      THE EASTERN DISTRICT OF
                                      )      KENTUCKY
GEORGETOWN COMMUNITY, LLC,       )
                                      )
       *Defendant-Appellee.*       )

**BEFORE:**    **BOGGS, Chief Judge, GIBBONS, Circuit Judge, and ROSE, District Judge.**[*]

    **ROSE, District Judge.**  Defendant-Appellee Georgetown Community, LLC, breached a contract it had formed with Plaintiff-Appellant Network Health Services, Inc.  Because Network Health Services did not present evidence concerning the amount of damages it suffered, the United States District Court for the Eastern District of Kentucky entered summary judgment in favor of Georgetown Community on Network Health Services' breach of contract claim.  Because damages cannot be awarded in a breach of contract claim in Kentucky if the amount of damages is speculative, we affirm the decision of the district court.

**I.**

    In early 2001, Georgetown Community, a hospital located in Georgetown, Kentucky,

---

    [*]The Honorable Thomas M. Rose, United States District Court for the Southern District of Ohio sitting by designation.

wanted to add a bariatric surgery program to the services it offered. Bariatric surgery is an invasive procedure available to some obesity patients where doctors alter the digestive process by closing off parts of the stomach to make it smaller. Some of these operations combine stomach restriction with a partial bypass of the small intestine. These procedures create a direct connection from the stomach to the lower segment of the small intestine, bypassing portions of the digestive tract that absorb calories and nutrients. As Georgetown Community had not previously managed a bariatric surgery program, it contracted with Network Health Services, an Indiana corporation that manages bariatric surgery programs, to assist in managing its new program.

On May 1, 2001, Georgetown Community and Network Health Services entered into a contract entitled "Bariatric Center Program Agreement." Pursuant to the agreement, Network Health Services agreed to manage Georgetown Community's bariatric surgery program and provide consulting services to Georgetown Community for a flat monthly fee of $8,500.00. Network Health Services was to provide a variety of services including: "coordinating the continuum of care for each patient admitted to the program," providing specialized administrative consulting services such as the insurance authorization services, executing a community education program, operating a call center service, and advertising the bariatric center. J.A. 57-58. The term of the agreement was two years. After the first year of the agreement, either party could terminate the agreement without cause by providing written notice at least 90 days in advance to the other party. A non-compete clause in the contract provides:

> During the term of this agreement and for one (1) year after expiration or earlier termination of this Agreement Hospital shall not, *without consideration to be agreed between the Parties and written approval from NHS*, market or enter into any agreement or arrangement with any other party to develop, enhance, manage, or

market its bariatric surgery product line.

J.A. 60, Agreement, ¶7(a) (emphasis added).

On December 16, 2002, Georgetown Community gave Network Health Services written notice of its intent to terminate the agreement effective March 17, 2003. Even though the parties had not agreed to an amount of consideration for suspending the non-compete agreement, Georgetown Community began marketing its bariatric surgery program by conducting its own information seminars and implementing its own advertising campaign.

Network Health Services filed a complaint in United States District Court on August 27, 2003, asserting breach of contract with jurisdiction premised on diversity. The complaint sought damages in an amount to be determined at trial, and attorney's fees and costs. Georgetown Community countered with a motion for summary judgment, asserting that the non-compete clause is unenforceable under Kentucky law and that Network Health Services did not suffer any damages from Georgetown Community's actions. J.A. 16. Network Health Services responded, pointing out that covenants not to compete are enforceable under Kentucky law and claiming its damages amounted to "at least $8,500 per month for two years" and an "entitle[ment] by contract to a negotiated consideration in exchange for releasing [the h]ospital from the covenant not to compete." J.A. 32. The district court awarded summary judgment to Georgetown Community on the theory that Network Health Services had failed to produce any admissible evidence that might establish the amount of damages to which it was entitled. This appeal ensued.

## II.

On appeal, Network Health Services asserts that the "amount the parties would have agreed

3

had Georgetown honored its obligations and entered into post-termination negotiations is the measure of damages in this case." In effect, Network Health Services asserts the parties agreed to agree to a post-termination damage award.

As a general rule, parties may contract to agree to terms of a contract in limited situations. See *Ridgeway Coal Co., Inc. v. FMC Corp.*, 616 F. Supp. 404, 407 (S.D.W. Va. 1985). "To do so, however, it is necessary that the terms to be agreed upon in the future be substantially drawn from the initial agreement." *Id.* (citing *Frank Horton & Co. v. Cook Elec. Co.*, 356 F.2d 485 (7th Cir. 1966). The terms must be determinable "independent of a party's mere 'wish, will and desire...' either by virtue of the agreement itself or by commercial practice or other usage or custom." *Id.* (citing *United. States v. Orr Constr. Co.*, 560 F.2d 765, 769 (7th Cir. 1977) (quoting 1 CORBIN ON CONTRACTS, § 95, at 402)). When the terms of a preliminary agreement are not determinable "an agreement to enter into negotiations in the future cannot be enforced because the court has no means to determine what sort of contract the negotiations would have produced." *Weitzman v. Steinberg*, 638 S.W.2d 171, 175 (Tex. Ct. App. 1982). Parties can avoid this principle when they have agreed to basic terms, leaving only nonessential elements subject to negotiations. *Eckles v. Sharman*, 548 F.2d 905, 909 (10th Cir. 1977). Although Kentucky law allows parties to agree to liquidated damages, *see Man O'War Rests., Inc. v. Martin,* 932 S.W.2d 366, 368 (Ky. 1996), the agreement in this case contains no such provision.

In the absence of a liquidated damages provision, Kentucky courts require an evidentiary basis that reasonably supports the amount of damages. *Illinois Valley Asphalt, Inc. v. Harry Berry, Inc.*, 578 S.W.2d 244, 245-46 (Ky. 1979).

4

> Mere uncertainty as to the amount will not preclude recovery. There must be presented, however, sufficient evidence on which a reasonable inference as to the amount of damage can be based. In proving a claim of loss of profits of an established business, the record of past profits is usually the best available evidence. Mere "estimates" of witnesses will not serve, if books were kept. McCormick states: "Opinions of witnesses as to the amount of profits that would have been gained are not admissible, except where the opinion is that of an expert [b]ased upon relevant facts."

*Id.* (citation omitted) (holding that the "guess estimate" of a business owner based on what might have happened "if we had been lucky" fell short of the quality of evidence required to permit an inference of the approximate amount of damage or to furnish a rational basis for computation of the loss).

In the instant case, evidence concerning the amount of profit Network Health Services had been recognizing on the implementation of the contract would have provided a reasonable basis for an award. Evidence of this could have been submitted in the form of an affidavit from Network Health Services' accountant. Instead, Network Health Services relied upon its president's ambiguous assertion that the "value of the services provided [by NHS] is greater than the sum of the monthly payments." Br. at 14. This assertion does not allow a reasonable inference as to the amount of damage because even if there were evidence that the value of Network Health Services' efforts was greater than $8,500 a month, any award would have to be reduced by the unknown amount that Network Health had to expend in the implementation of the service. In the absence of evidence concerning the amount of Network Health Services' profit or loss on the contract, or evidence that would support the calculation of damages under some other theory, the amount of any award would be speculative.

Another possible theory, though one not argued by Network Health Services, is Professor Farnsworth's argument that the appropriate remedy for breach of a duty to negotiate is not expectation damages but damages caused by the injured party's reliance on the agreement to negotiate. E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiation*, 87 COLUM. L. REV. 217, 267 (1987). "If one party breaks off the negotiations before the other has relied on the agreement to negotiate, there is no need to fashion a remedy because no relief is called for. Once the other party has relied, it must prove the loss caused by its reliance, including any lost opportunities." *Id.* (footnote omitted). In the instant case, however, Network Health Services has not provided any evidence regarding the amount of damages it has sustained by virtue of its reliance.

Another possible measure of damages might be what Georgetown Community would pay to be free of the contract. It would seem that one could establish an upper limit as to what Georgetown Community would have been willing to pay in order to get out of its contract: $76,500, the amount of the remaining payments. Even this fails as a limit, however, because Georgetown Community may have been willing to pay a premium above $76,500 to Network Health Services to get out of the contract if it believed Network Health Services' performance was so deficient that Georgetown Community might be better off paying even more just to be rid of the mistake of entering into the contract. While Network Health Services repeatedly asserts that the program was profitable because of its growth, the fact that a business is growing does not assure its profitability. Businesses often sell goods at a loss as part of calculated business plans that accept short-term losses in hopes of long-term profitability. All the record shows is that the program grew from 6 to 30

operations per month.  J.A. 69.  We are not informed if this is better or worse than the nationwide rate of growth in this type of surgery–better or worse than Georgetown Community might have done on its own.

## III.

The district court correctly determined that Georgetown Community was entitled to summary judgment.  Because Network Health Services produced no pleadings, depositions, answers to interrogatories or admissions on file that would allow a jury to reasonably base an award upon evidence regarding the amount of damages, the Court **AFFIRMS** the decision of the district court.